IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTEL CORPORATION,              )
                                )
              Plaintiff,        )
                                )
       v.                       )       C.A. No. 14-377 (LPS)
                                )
FUTURE LINK SYSTEMS, LLC,       )
                                )
              Defendant.        )

## INTEL'S ANSWERING BRIEF IN OPPOSITION TO
## FUTURE LINK SYSTEMS' MOTION TO DISMISS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiff*

OF COUNSEL:

Adam Alper
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94194
(415) 439-1400

Michael W. De Vries
Jason Choy
Tim G. Majors
Christopher M. Lawless
KIRKLAND & ELLIS LLP
333 S. Hope Street
Los Angeles, CA  90071
(213) 680-8400

Gregory S. Arovas
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4766

July 30, 2014

# TABLE OF CONTENTS

I.  Introduction .................................................................................................................1

II.  Nature and Stage of the Proceedings ........................................................................2

III.  Summary of the Argument .........................................................................................2

IV.  Statement of Facts ......................................................................................................5

    A.  Future Link's Licensing Demands To Intel's Customers Are Based On
Intel Products .................................................................................................5

    B.  In Response To Future Link's Assertions, Intel's Customers Sought
Indemnity In Accordance With Their Supply Agreements ............................7

    C.  Intel Designs, Develops, Manufactures, And Sells Computer Chips That
Provide The Accused Technologies ...............................................................7

    D.  The Patents-In-Suit Originated At Computer Chip Companies, And Were
Subsequently Assigned To Future Link To Be Monetized .............................8

V.  Argument ...................................................................................................................8

    A.  An Actual Controversy Exists Supporting Jurisdiction In This Case ...............8

        1.  Future Link's Accusations Directed To Technologies On Intel's
Computer Chips Establish Jurisdiction .............................................8

        2.  Intel's Indemnity Obligations To Its Customers Independently
Establish Standing ...........................................................................12

    B.  Intel's Claims Are Well Pleaded ..................................................................17

        1.  Intel Seeks A Declaratory Judgment That Its Products Containing
The Technologies Accused By Future Link Do Not Infringe ...........17

        2.  Intel's License And Exhaustion Claims Sufficiently Identify The
License At Issue ..............................................................................19

VI.  Conclusion ...............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*3M Co. v. Avery Dennison Corp.*,
  673 F.3d 1372 (Fed. Cir. 2012).............................................................................. 9

*ActiveVideo Networks, Inc. v. Trans Video Elecs.*,
  975 F. Supp. 2d 1083 (N.D. Cal. 2013) ............................................................... 16

*Alien Technology Corp. v. Intermec, Inc.*,
  No. 3:06-CV-51, 2007 WL 63989 (D.N.D. 2007).............................................. 18

*Applera Corp. v. Thermo Electron Corp.*,
  No. Civ.A. 04-1230, 2005 WL 524589 (D.Del. Feb. 25, 2005) ........................ 18

*ARRIS Group, Inc. v. British Telecoms PLC*,
  639 F.3d 1368 (Fed. Cir. 2011).................................................................. passim

*Asahi Glass Co., Ltd. v. Guardian Indus. Corp.*,
  276 F.R.D. 417 (D. Del. 2011) .............................................................................. 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................... 4, 17

*Barnhardt Mfg. Co. v. Illinois Tool Works, Inc.*,
  No. 3:08-CV-617-W, 2010 WL 1571168 (W.D.N.C. Apr. 16, 2010)............................. 12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................... 4, 17

*Cold Spring Granite Co. v. Matthews Intern. Corp.*
  No. 10-4272 (JRT/LIB), 2011 WL 4549407 (D. Minn. 2011) ........................... 18

*Danisco U.S. Inc. v. Novozymes A/S*,
  744 F.3d 1325 (Fed. Cir. 2014)............................................................................. 9

*EchoStar Satellite LLC v. Finisar Corp.*
  515 F. Supp. 2d 447 (D. Del. 2007).................................................................... 20

*Edmunds Holding Co. v. Autobytel Inc.*,
  598 F. Supp. 2d 606 (D. Del. 2009)...................................................................... 6

*Fin. Fusion, Inc. v. Ablaise LTD*,
  No. C-06-2451, 2006 WL 2792872 (C.D. Cal. Sept. 28, 2006) ................................. 14, 15

*Gould Elecs., Inc. v. United States*,
  220 F.3d 169 (3d Cir. 2000)............................................................................. 6, 15

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)................................................................................................... 1, 9, 10

*Microchip Tech. Inc. v. Chamberlain Grp., Inc.*,
    441 F.3d 936 (Fed. Cir. 2006).................................................................................... 13, 16

*Micron Tech., Inc. v. Mosaid Techs. Inc.*,
    518 F.3d 897 (Fed. Cir. 2008).......................................................................................... 9

*Microsoft Corp. v. DataTern, Inc.*,
    Nos. 2013–1184, 2013–1185, WL 1760882 (Fed. Cir. May 5, 2014)........... 11, 12, 13, 16

*Microsoft Corp. v. Phoenix Solutions, Inc.*,
    741 F. Supp. 2d 1156 (C.D. Cal. 2010) ........................................................................ 14

*Proofpoint, Inc. v. InNova Patent Licensing, LLC*,
    No. 5:11-CV-02288-LHK, 2011 WL 4915847 (N.D. Cal. Oct. 17, 2011)...................... 15

*Resnik v. Woertz*,
    774 F. Supp. 2d 614 (D. Del. 2011)................................................................................ 6

*S.O.I.TEC Silicon On Insulator Techs, S.A. v. MEMC Elec. Materials, Inc.*,
    No. 08-cv-292, 2009 WL 423989 (D. Del. Feb. 20, 2009)............................................. 18

*St. Clair Intellectual Prop. Consultants, Inc. v. Apple, Inc.*,
    No. 10-cv-982, 2011 WL 4571812 (D. Del. Spt. 30, 2011) ........................................... 19

*Terra Nova Ins. Co. v. 900 Bar, Inc.*
    887 F.2d 1213 (3d Cir. 1989)........................................................................................ 20

*Wistron Corp. v. Phillip M. Adams & Assocs., LLC*
    No. C-10-4458, 2011 WL 1654466 (N.D. Cal. Apr. 28, 2011)...................................... 18

*Xpoint Techs, Inc. v. Microsoft Corp.*,
    730 F. Supp. 2d 349 (D. Del. 2010)............................................................................... 18

**Statutes**

28 U.S.C. § 1782.................................................................................................................... 7

**Rules**

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 6

Fed. R. Civ. P. 15(a)(2)........................................................................................................ 4

## I.   INTRODUCTION

There is a clear and present dispute between Intel and Future Link concerning whether Future Link's patents cover technologies within Intel chips incorporated into products for which Future Link has demanded royalties.  Under the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007), and subsequent Federal Circuit precedent, no more is required to invoke this Court's jurisdiction.  Future Link cannot demand that Intel's customers pay patent license royalties on the theory that Future Link's patents cover technologies found in Intel's chips, but avoid having Intel challenge that proposition in this Court.

Future Link is demanding that Intel customers take licenses based on allegations that chip-level technologies within the customers' products practice nine Future Link patents—patents that originated from computer-chip companies that compete with Intel.  Future Link's assertions of its patents against Intel's customers directly target and specifically identify Intel's chips.  That is more than sufficient to create jurisdiction over Intel's action.  Future Link's strategy follows a well-worn path—make infringement allegations that focus on chipmakers but attack downstream manufacturers to capture a larger royalty base.  This is exactly the kind of dispute the Declaratory Judgment Act was intended to address, and Intel has every right to intervene to stop the pursuit of its customers (and lift the cloud over its own products) based on assertions that are ultimately about Intel's chips.  Intel's claims regarding this conduct are adequately pleaded and should not be dismissed.

Intel's complaint identifies nine patents and specific Intel technologies at issue.  Intel does not ask this Court to resolve issues of infringement on Future Link's entire patent portfolio and Intel's entire product line.  Likewise, Intel has provided adequate specificity regarding its license and exhaustion defense, identifying the license and patents to which that defense applies.  Intel's complaint details multiple allegations of indemnity and direct and indirect infringement

1

involving its products as a result of Future Link's claims. That is more than enough at the pleading stage. Future Link's motion should be denied.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Intel Corporation ("Intel") filed its Complaint for Declaratory Judgment against Future Link Systems, LLC ("Future Link") on March 24, 2014. Counts 1–18 of Intel's Complaint seek declaratory judgments of non-infringement and invalidity of nine patents now owned by Future Link that Future Link asserted against Intel's customers based on their inclusion of Intel components in their products. Counts 19 and 20 of Intel's Complaint seek declaratory judgments of license and exhaustion for at least five of the nine asserted patents based on a license between Intel and a former owner of the patents. On June 13, 2014, Future Link filed a Motion to Dismiss, arguing that Intel should not be permitted to resolve Future Link's assertions against Intel's customers. (D.I. 8; D.I. 9.) Because this Court has subject matter jurisdiction over Intel's request to resolve Future Link's assertions against Intel products, Intel opposes Future Link's Motion.

## III.    SUMMARY OF THE ARGUMENT

1. Future Link's Motion asserts that Intel should not be allowed to proceed (1) because there is no justiciable controversy between Future Link and Intel and (2) because Intel's allegations are insufficiently pleaded. Neither assertion withstands scrutiny.

2. *First*, there is a justiciable controversy invoking this Court's subject matter jurisdiction. Before this action was filed, Future Link explicitly asserted that Intel's customers' products infringe the nine patents-in-suit because of component technologies they contain— components that are provided by Intel. Specifically, Future Link sent letters to Intel's customers asserting that their use of standardized and proprietary chip-based technologies found on Intel's components infringes each of the patents-in-suit. Because Future Link's

allegations against Intel's customers target technologies that are undisputedly provided by Intel products, Intel has standing either as a purported indirect or direct infringer. Contrary to the representations in its motion, Future Link did not merely implicate Intel's products in some vague fashion in its demand letters. Rather, Future Link directly identified technologies residing on Intel's computer chips as allegedly infringing the patents-in-suit. Indeed, Future Link and its predecessors have conceded that technologies they accuse of infringing the patents-in-suit reside on Intel's chips, naming specific Intel products as practicing the technologies that allegedly infringe Future Link's patents. Accordingly, a substantial controversy exists between Future Link and Intel, which governing authority entitles Intel to resolve.

3.  In response to Future Link's assertions, Intel's customers contacted Intel and demanded indemnity in accordance with agreements governing Intel's sales to its customers. That alone compels a finding that this Court has jurisdiction and provides a separate basis for denying Future Link's Motion to Dismiss.[1] As alleged in the Complaint, pursuant to Intel's indemnification obligations in its supply agreements, the customers who received Future Link's demand letters (Dell, HP, and Promise) requested that Intel indemnify them against Future Link's claims. (D.I. 1 ¶ 14.) Intel's supply agreements set forth Intel's obligations to indemnify its customers against third-party infringement claims like those raised by Future Link. *Id.* Future Link's argument that Intel has not alleged that it has any obligations to indemnify is simply incorrect as a factual matter and in conflict with Intel's allegations in the

---

[1]  *ARRIS Group., Inc. v. British Telecoms PLC*, 639 F.3d 1368, 1375 (Fed. Cir. 2011) ("where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if (a) the supplier is obligated to indemnify its customers from infringement liability . . . .").

Complaint. (*See* D.I. 1 ¶ 14.) Thus, there is no basis for dismissing the Complaint for lack of jurisdiction.

4. *Second*, Future Link's arguments that Intel's Complaint is insufficiently pleaded also lack merit. Intel's Complaint does not seek a declaratory judgment of non-infringement with respect to Intel's entire product line. Rather, Intel's Complaint seeks a declaratory judgment that the Intel products targeted by Future Link's infringement allegations—*i.e.*, the Intel components that provide the chip-level technologies targeted by Future Link's assertions, including the *specific Intel products named in Future Link's assertion letters*—do not infringe. Intel's Complaint thus sufficiently identifies the products that are the subject of Intel's declaratory judgment claims and readily satisfies *Iqbal* and *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*").

5. Similarly, there is no basis for Future Link's contention that Intel's license and exhaustion claims are insufficiently pleaded. Future Link professes ignorance regarding the license and the patents to which it applies, but Intel's Complaint identifies the precise date of the license (July 15, 1990) and the counter-party to the agreement (a prior alleged owner of the patents-in-suit, information in Future Link's possession). (*See* D.I. 1 ¶ 143.) Intel also specifically identifies the five patents that Intel currently believes are subject to that license. This is more than sufficient at the pleading stage.[2]

---

[2] Although the motion to dismiss should be denied in its entirety, at a minimum, Intel should be granted leave to amend. Fed. R. Civ. P. 15(a)(2) ("[t]he court should freely give leave [to amend] when justice so requires."); *Asahi Glass Co., Ltd. v. Guardian Indus. Corp.*, 276 F.R.D. 417, 419 (D. Del. 2011) ("where the non-moving party will not suffer substantial or undue prejudice, denial [of leave to amend] must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments

## IV.    STATEMENT OF FACTS

### A.    Future Link's Licensing Demands To Intel's Customers Are Based On Intel Products

Beginning in April 2013, Future Link initiated a campaign to assert the patents-in-suit against Intel components by sending licensing demand letters to at least the three Intel customers identified in Intel's Complaint: Dell, HP, and Promise.[3]  (Exs. 1–3 (all exhibits cited herein are to the concurrently-filed supporting Declaration of Timothy G. Majors); D.I. 1 ¶¶ 9–11.)  In these letters, Future Link states that it acquired over two hundred issued and pending patents that were previously owned by NXP Semiconductors (one of the chip companies from which the patents originated).  (*Id.*)  Future Link further states that Dell, HP, and Promise's products "incorporate and use features and functionalities covered by [Future Link's] patents . . . ."  (*Id.*)  To avoid any doubt as to which of the specific components within Dell, HP, and Promise's products Future Link accuses of infringement, Future Link provided "Table 1," which specifies, on a patent-by-patent basis, the particular on-chip technologies that are accused:

- For the '302 patent, Future Link accuses "a processor that incorporate[s] multiple thermal sensors into a processor core" of infringement;

- For the '570, '738, '6576, '357, '166, and '0576 patents, Future Link accuses the PCI, PCIe and QPI on-chip communications technologies of infringement;

- For the '823 patent, Future Link accuses "processor[s] capable of performing Write-Combining," identifying particular Dell, HP, and Promise computers that contain Intel processors;

previously allowed, or futility of amendment," none of which are present here) (internal quotations omitted).

[3]    Future Link accused Dell of infringing the nine patents-in-suit, HP of infringing eight out of the nine, and Promise of infringing five of the nine patents.  (Exs. 1–3.)

- For the '108 patent, which generally relates to interconnect testing, Future Link's accusations encompass all products involving testing of "DDR3 SDRAM, DDR3 SDRAM memory modules, and/or GDDR5 SGRAM" memory.

(*Id.*) All of these technologies reside on Intel components that are supplied to customers. (D.I. 1 ¶¶ 7, 9, 12.)[4] Future Link's allegations go on to identify particular Dell, HP, and Promise computers that include Intel microprocessors and chipsets, directly implicating Intel's products. (*Id.*) And Future Link's letters go further, even identifying specific Intel products, both in Future Link's "Table 1" to Dell—which identifies "Intel Xeon 5500, 5600, E5 or E7 series processors"—and also through Future Link's cross-reference to a claim chart previously provided by the prior owner of the patents-in-suit, NXP Semiconductors (Ex. 1 at 1), which accused PCIe and explicitly identified the "Intel X58 chipset" as supplying the PCIe technology (*e.g.*, Ex. 4 at 10, NXP claim chart re '6576 patent).

Future Link identifies Intel products because the technologies accused by Future Link of infringing uniquely reside on Intel's components. For example, the PCIe technology that Future Link accuses of infringing the '6576, '357, and '166 patents is provided by Intel chipsets within the customers' products, as shown in the product brief for the Intel X58 chipset. (Ex. 5, Product Brief for Intel X58 Express Chipset.) The QPI technology accused by Future Link is likewise

---

[4] Rule 12(b)(1) motions may present either a facial or factual challenge to the court's subject matter jurisdiction. *Edmunds Holding Co. v. Autobytel Inc.*, 598 F. Supp. 2d 606, 608 (D. Del. 2009). Where, as here, the movant presents a facial challenge, the court must accept as true all factual allegations in the complaint, and may also consider documents referenced in the complaint or attached thereto. *Id.* (citing *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)); *see also Resnik v. Woertz*, 774 F. Supp. 2d 614, 627 (D. Del. 2011) ("The court construes the Individual Defendants' Rule 12(b)(1) motion to dismiss for lack of standing and ripeness to be a facial attack on the complaint, rather than a factual one, because it challenges the sufficiency of the complaint itself as opposed to challenging the facts underlying the jurisdictional basis of the complaint.").

provided by Intel's chips, as shown in the product brief for the Intel X58 chipset identified in NXP's claim chart. (Ex. 5.) And Link Systems, a company related to Future Link and controlled by the same principals, sued Intel's customer Fujitsu in Germany in 2013, claiming infringement of a European counterpart to the '0576 patent based on Intel's QPI technology. Recently, Link Systems—represented by the same counsel as Future Link in this lawsuit—sought evidence under 28 U.S.C. § 1782 of Intel's QPI specifications for use in the German lawsuit. (Ex. 6 at 6; Ex. 7 at 7.) The same applies to the other accused technologies—all are on Intel's chips. (D.I. 1 ¶¶ 7, 9, 12.)

### B. In Response To Future Link's Assertions, Intel's Customers Sought Indemnity In Accordance With Their Supply Agreements

As set forth in Intel's 1996 Corporate Agreement with Dell (and subsequent related agreements), Intel's 2006 Memorandum of Understanding with HP (and subsequent related agreements), and Intel's February 2012 Standard Terms and Conditions of Sales governing Intel's sales of products that end up in Promise's products, Intel has indemnity obligations to its customers for covered third-party patent infringement claims directed to Intel's products. (D.I. 1 ¶ 14.) In accordance with those agreements—and consistent with the fact that Future Link expressly accused Intel technologies—Dell, HP, and Promise each independently sent an indemnity demand to Intel based on Future Link's assertions. (*Id.*) In view of Future Link's assertions, which directly implicate Intel's indemnity obligations in those customer agreements (*see id.*), Intel filed this lawsuit to clear the cloud over its products created by Future Link's assertions of the patents-in-suit.

### C. Intel Designs, Develops, Manufactures, And Sells Computer Chips That Provide The Accused Technologies

Intel is one of the world's largest developers of computer chip technologies and suppliers of computer chips. Intel sells these chips to customers who incorporate them into end user

products, such as laptops, desktop computers, and other products.  (D.I. 1 ¶ 12.)

As stated above, Intel supplies computer chips incorporating the technologies accused by Future Link.  Specifically, Intel's chips include (1) thermal sensor technology; (2) PCI, PCIe, and QPI communications technologies; (3) SDRAM and SGRAM memory-interface technologies; and (4) testing circuitry.  (D.I. 1 ¶¶ 9–12.)  Although Intel's chips are incorporated into end user products by its customers, and although it denies infringement, Intel's chips provide technologies that Future Link accuses of infringing the patents-in-suit.  (*Id.*)

### D. The Patents-In-Suit Originated At Computer Chip Companies, And Were Subsequently Assigned To Future Link To Be Monetized

Future Link is a non-practicing entity that was formed in order to monetize patents that were assigned to it.  Future Link claims that it owns over 200 U.S. patents and patent applications.  (D.I. 1 ¶¶ 9–11; Ex. 1, Apr. 15, 2013, Letter from Future Link to Dell; Ex. 2, Apr. 15, 2013, Letter from Future Link to HP.)  All of Future Link's patents originated from companies involved in the design and supply of computer chips:  Philips Electronics, VLSI Technology, and NXP Semiconductors.  *Id.*

Consistent with their origins, Future Link asserts that the nine patents-in-suit apply to technologies that reside on computer chips.  (Exs. 1–3.)  Future Link contends the nine patents apply to four on-chip technologies:  (1) on-chip thermal sensors; (2) standardized and proprietary on-chip communication technologies such as PCI, PCIe, and QPI, which control how data is input and output from the chips; (3) technologies for controlling how chips save data into memory; and (4) on-chip testing circuitry.  (*Id.*)

## V.   ARGUMENT

### A.   An Actual Controversy Exists Supporting Jurisdiction In This Case

#### 1.   Future Link's Accusations Directed To Technologies On Intel's Computer Chips Establish Jurisdiction

Future Link's repeated accusations are knowingly and intentionally directed at technologies residing on Intel's computer chips. That is more than sufficient to establish subject matter jurisdiction in this case. As Future Link acknowledges, declaratory judgment jurisdiction is proper where (1) the patent holder's conduct has created an actual controversy between the parties; and (2) the dispute is sufficiently immediate and real. *See, e.g., 3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1376 (Fed. Cir. 2012). This standard ***does not*** require an apprehension of suit by the declaratory judgment plaintiff itself. The Supreme Court specifically rejected that notion in its landmark *MedImmune* decision, replacing the prior test with a more lenient inquiry that considers the "totality of the circumstances." *See, e.g., MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (overruling the "reasonable apprehension of suit" test); *Micron Tech., Inc. v. Mosaid Techs. Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008) (applying the "more lenient legal standard" of *MedImmune*); *3M*, 673 F.3d at 1376. As held by the Supreme Court and repeatedly confirmed by the Federal Circuit, one purpose of the Declaratory Judgment Act is to allow alleged infringers to clear the cloud of infringement over their products, thereby eliminating an alleged infringer's choice "between abandoning his rights or risking prosecution," regardless if one is about to be sued. *MedImmune*, 549 U.S. at 129; *Danisco U.S. Inc. v. Novozymes A/S*, 744 F.3d 1325, 1332 (Fed. Cir. 2014).

Intel properly invokes this purpose of the Declaratory Judgment Act with this suit. As set forth in detail in the Complaint, Future Link's letters assert that a license is "required" for at least the nine patents-in-suit, and maybe others. (Exs. 1 and 2 at 1.) Future Link goes on to accuse technologies existing on Intel's computer chips of infringement, and in some cases identifies actual Intel chips by model number. (Exs. 1–5; D.I. 1 ¶¶ 9–12.) As a result, Intel's customers demanded indemnity from Intel in accordance with supply agreements governing Intel's sales of its products, further confirming the actual controversy that Future Link has created. (D.I. 1 ¶ 14.) These facts demonstrate that Future Link's assertions have created a cloud over Intel's products, which Intel continues to make substantial investments in developing, manufacturing,

and selling to its customers.  Intel is entirely within its jurisdictional rights to promptly and efficiently resolve that controversy through this action.  *MedImmune*, 594 U.S. at 774.

Future Link's arguments in support of its motion to dismiss are unavailing.  Future Link contends that Intel's Complaint does not allege any "affirmative acts" by Future Link directed at Intel products.  (D.I. 9 at 2–3.)  That is incorrect.  As alleged in the Complaint, Future Link accuses Intel technologies in its letters, identifying them by name in Table 1 for each patent, and identifying Intel chips by model number.  (Exs. 1 and 2 at 2–4; Ex. 4 at 10; D.I. 1 ¶¶ 9–11.)  The specific models of Dell, HP, and Promise products identified by Future Link in its letters contain Intel chips with the accused technologies.  (Exs. 1–3; Ex. 4 at 10; D.I. 1 ¶¶ 7, 9, 12.)  And to the extent Future Link contends that Intel must plead the existence of a direct communication from Future Link to Intel alleging infringement, the Federal Circuit has explicitly rejected any such requirement.  *See, e.g. ARRIS Group v. British Telecomms.*, 639 F.3d 1368, 1379 (Fed. Cir. 2011) ("First, BT argues . . . [it] did not explicitly accuse Arris itself of direct or indirect infringement.  But such an express accusation is unnecessary.").

Future Link next asserts that there is an "absence of a controversy over direct infringement liability" in this case.  (D.I. 9 at 3.)  This is also incorrect and is unsupported by Future Link's motion.  As shown above, Future Link's accusations target technologies residing on Intel computer chips.  (*See* Section IV, *supra*.)  As a matter of patent law, Intel's relevant sales of such computer chips would, based on Future Link's accusations, constitute ***direct infringement.***  Indeed, the ***primary*** form of infringement that will be adjudicated in this action will be whether Intel's chips directly infringe.  Moreover, the fact that Intel's customers responded to Future Link's assertions by requesting indemnity under their supply agreements with Intel confirms that Intel's components provide the accused functionalities.

Future Link relies on *ARRIS Group* to suggest there can be no direct-infringement liability unless licensing demands were made directly to a supplier of allegedly infringing components.  (D.I. 9 at 4.)  But that is not the holding.  *ARRIS Group* merely states where, ***unlike here***, there are no infringement allegations relying exclusively on an upstream supplier's

10

products, a supplier can *still* have standing to assert a DJ claim on the basis of indirect infringement so long as "the supplier's product functions as a material component" of an allegedly infringing system. *ARRIS Group,* 639 F.3d at 1375.[5]  Indeed, it would make no sense to preclude Intel from adjudicating whether its products directly infringe the patents-in-suit when that is exactly what Future Link alleges in its letters.

   Future Link also contends that the Complaint should be dismissed because it does not sufficiently allege induced or contributory infringement. (D.I. 9 at 3–6.)  Not so.  Future Link's assertions also implicate indirect infringement by Intel's products, and the Complaint alleges substantial facts demonstrating a controversy over contributory and induced infringement.  As set forth above, Future Link repeatedly, for each of the nine patents-in-suit, identifies Intel technologies as the source of the alleged infringement.  (Exs. 1–3; Ex. 4 at 10; D.I. 1 at ¶¶ 9–11.)  For instance, the Complaint identifies Future Link's threats against "Intel's customers, based, for example, on those customers' alleged use of technologies provided by Intel components" (D.I. 1 at ¶¶ 9–11), implicating indirect infringement by Intel on account of its supply of those components for its customers' use.  These exact types of allegations were found to sufficiently plead indirect infringement in *Microsoft v. DataTern*—a case that Future Link acknowledges is controlling authority.  *Microsoft Corp. v. DataTern, Inc.*, Nos. 2013–1184, 2013–1185, 2014 WL 1760882 (Fed. Cir. May 5, 2014).  In *DataTern*, the Federal Circuit found that two upstream product suppliers (SAP and Microsoft) had declaratory judgment jurisdiction for all patents where the patent holder had identified the suppliers' products in claim charts sent to the suppliers' customers.  *DataTern*, 2014 WL 1760882, at *4.  Although the court found that Microsoft lacked standing with respect to one patent, that was because, unlike the claim charts for the others, the patentee "cite[d] *exclusively to third-party*—not Microsoft-provided—

---

[5]   Under this standard, as discussed below, Intel's suit is also proper on the basis of Future Link's indirect infringement allegations.

documentation for several key claim elements." *Id.*[6] This contrast in *DataTern* confirms exactly what is required: accusations directed at a supplier's product establish jurisdiction over indirect infringement claims—no more is needed. *See, e.g., id.*; *see also ARRIS Group*, 639 F.3d at 1375.

Lastly, Future Link contends that Intel's declaratory judgment claims must allege that additional elements of induced or contributory infringement are met—*e.g.,* an "accusation by Future Link that Intel products are 'not suitable for substantial non-infringing uses' or that Intel knew such products were 'especially made or adapted for use in an infringement' of Future Link's patents." (D.I. 9 at 5–6.) But *DataTern* holds that allegations identifying and targeting the suppliers' products are sufficient for indirect infringement. *DataTern*, 2014 WL 1760882, at *4. And Intel's Complaint alleges facts supporting these elements. As set forth in the Complaint, Future Link broadly identified particular Intel technologies—*e.g.,* PCI, PCIe, QPI, etc.—as infringing, *no matter how they are used.* (D.I. 1 ¶¶ 9–11.) For example, Future Link broadly accused *all products* "using, and/or supporting the PCI-Express (PCIe) standard." (Ex. 1 at 2, 4; Ex. 2 at 2–3; Ex. 3.) Because Future Link is accusing any and all uses of particular Intel chip technologies, Future Link's allegations rule out non-infringing uses when Intel supplies its customers with its chips that include those technologies.[7] *Id.*

### 2.    Intel's Indemnity Obligations To Its Customers Independently Establish Standing

---

[6]    Throughout this brief, emphases are supplied except where noted otherwise.

[7]    This case thus differs from *Barnhardt Mfg. Co. v. Illinois Tool Works, Inc.* (D.I. 9 at 6.) There, the supplier of non-infringing base components (raw chemicals) attempted to establish jurisdiction in a declaratory judgment action involving a patent directed to methods for creating and applying a specific adhesive foam. *Barnhardt*, No. 3:08-CV-617-W, 2010 WL 1571168, at **4–5 (W.D.N.C. Apr. 16, 2010). The court lacked subject matter jurisdiction because it was undisputed that the supplier's base components had numerous non-infringing uses. *Id.* In contrast, Future Link accuses Intel's components (*e.g.,* CPUs and chipsets with the accused functionalities) of infringing under all circumstances. Under Future Link's accusations, there are no substantial non-infringing uses of Intel's accused components, and Intel knows that it makes its chips to include the accused functionalities. That is legally sufficient to establish subject matter jurisdiction.

Even if one were to ignore all of the substantial foregoing record, Intel's pleading of indemnity obligations to its customers independently establishes jurisdiction. Future Link's motion as it relates to this issue is based on misdescriptions of Intel's pleading.

Future Link does not dispute that indemnity obligations alone confer standing on a supplier to bring a declaratory judgment action. (*See* D.I. 9 at 6 ("Supplier standing requires that the supplier is obligated to indemnify its customers from infringement liability...") (internal quotation marks and citation omitted).) Nor could it. It is well settled that "where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if ... the supplier is obligated to indemnify its customers from infringement liability." *ARRIS Group.*, 639 F.3d at 1375.

This standard is undoubtedly met here. As alleged in the Complaint, Future Link sent letters to at least three Intel customers—Dell, HP, and Promise—accusing them of infringement and demanding a license based on those customers' inclusion in their products of components supplied by Intel. (Exs. 1–3; D.I. 1 ¶¶ 9–12.) Because Future Link's assertions targeted technologies contained in Intel's chips, those customers (Dell, HP, and Promise) requested indemnity from Intel under Intel's supply agreements. (D.I. 1 ¶ 14.) As set forth in the Complaint, Intel's supply agreements obligate it to indemnify its customers against patent infringement claims, like Future Link's, that target Intel's products. (D.I. 1 ¶ 14.)

Courts both before and after *MedImmune* have made clear that such allegations are sufficient to establish the existence of an actual controversy. *See, e.g., DataTern*, 2014 WL 1760882, at *3 ("If Appellees had an obligation to indemnify their customers, they would then have standing to bring suit." (quoting *ARRIS Group.*, 639 F.3d at 1375)); *Microchip Tech. Inc. v. Chamberlain Grp., Inc.*, 441 F.3d 936, 943 (Fed. Cir. 2006) ("the existence of an indemnity agreement between Microchip and its customer" would "establish a legal relationship between [supplier] and a customer that had a legal interest adverse to [patentee]"); *Fin. Fusion, Inc. v.*

*Ablaise LTD*, No. C-06-2451, 2006 WL 2792872, at *3 (N.D. Cal. Sept. 28, 2006) (holding that

defendant's threats against FFI's customer's gave rise to subject matter jurisdiction over FFI's

declaratory suit because "FFI has alleged the existence of an indemnity agreement between itself

and its customers. This allegation is sufficient to satisfy the reasonable apprehension prong.");

*Microsoft Corp. v. Phoenix Solutions, Inc.*, 741 F. Supp. 2d 1156, 1162 (C.D. Cal. 2010)

("Because Microsoft is bound to indemnify American Express for infringement under the Tellme

system, there is an actual controversy between Microsoft and Phoenix under the theory that an

indemnification obligation between the service provider and customer creates an actual

controversy between the service provider and the patentee.").

    Future Link's arguments on this issue are uniformly based on misdescriptions of Intel's

allegations. Future Link argues that "customer[] indemnification requests … alone" cannot

create standing. (D.I. 9 at 5–6.) But Intel's Complaint does not allege just that Intel received

indemnification requests from specific customers (Dell, HP, and Promise): it also alleges that

Intel has indemnification agreements with its customers that obligate Intel to indemnify against

covered claims, like those made by Future Link, that are directed at Intel's products.

    Future Link also claims that Intel has not identified the customers that demanded

indemnity from Intel, or alleged that Intel has indemnity agreements with those customers. (*See*

D.I. 9 at 6–7.) Future Link's claims are categorically wrong. The Complaint alleges that "Intel

has received indemnity demands from ***its customers***"—obviously referring to Dell, HP, and

Promise, the companies discussed at length in the paragraphs preceding this allegation as the

Intel customers that demanded that Intel indemnify them against Future Link's claims targeting

Intel's products. (*See* D.I. 1 ¶¶ 9–14.) The Complaint also alleges that "Intel is obligated to

indemnify ***its customers*** for third-party patent infringement claims in accordance with the terms

of *the respective agreements governing sales to those customers*." (*See id.* at ¶ 14.)  These

allegations are sufficient to establish subject matter jurisdiction. *See, e.g., Fin. Fusion*, 2006 WL

2792872, at *3 (subject matter jurisdiction existed over FFI's declaratory suit because "FFI has

alleged the existence of an indemnity agreement between itself and its customers. This allegation

is sufficient to satisfy the reasonable apprehension prong."). These allegations also readily

distinguish Intel's Complaint from that at issue in the *Proofpoint* case cited by Future Link, in

which the court found no subject-matter jurisdiction because the supplier "has not alleged the

existence of a valid agreement nor described its supposed obligations." *Proofpoint, Inc. v.

InNova Patent Licensing, LLC*, No. 5:11-CV-02288-LHK, 2011 WL 4915847, at *5 (N.D. Cal.

Oct. 17, 2011). Here, Intel has both alleged the existence of valid indemnity agreements with its

customers that demanded indemnity, and described its obligations to indemnify under those

agreements.[8]

Next, Future Link argues that Intel fails to allege "whether Intel has agreements . . . that

do in fact obligate Intel to provide indemnity for liability arising from [Future Link's]

accusations." (D.I. 9 at 8.)  Again, Future Link ignores the allegations of the Complaint, which

specifically recite that "Intel *is obligated to indemnify its customers* for third-party patent

infringement claims"—referring to Future Link's claims against Intel's customers, Dell, HP, and

Promise—"in accordance with the terms of the respective agreements governing sales to those

customers." (D.I. 1 ¶ 14.)

---

[8]   Future Link cites two cases that it claims stand for the proposition that a supplier with an
indemnity obligation must produce the indemnity agreement. (D.I. 9 at 8.)  Neither of these
cases required the supplier to produce the indemnity agreement *with the complaint* in order
to establish standing—and such a rule would be contrary to the principle that, at the pleading
stage, the plaintiff's allegations must be accepted as true. *Gould Elecs., Inc. v. United States*,
220 F.3d 169, 176 (3d Cir. 2000) (holding that where the movant presents a facial challenge,
the court must accept all factual allegations in the complaint as true).

Future Link's suggestion that these allegations are insufficient under the Federal Circuit's decision in *DataTern* is likewise incorrect. In that case, the declaratory judgment plaintiff (Microsoft) affirmatively and repeatedly took the position, both in and out of court, that it did ***not*** owe any indemnity to its customers. *DataTern*, 2014 WL 1760882, at *2; *see also id.* at *1 (Microsoft was on record stating that it "had no obligation to defend or indemnify its customers" against DataTern's claims). This case is nothing like that: Intel has affirmatively alleged that it "***is obligated*** to indemnify its customers for third-party patent infringement claims in accordance with the terms of the respective agreements governing sales to those customers." (D.I. 1 ¶ 14.) Indeed, in *DataTern*, the Federal Circuit reaffirmed the rule that, "[i]f Appellees had an obligation to indemnify their customers, they would then have standing to bring suit." 2014 WL 1760882, at *3;[9] *Microchip Tech.*, 441 F.3d at 943 (jurisdiction can be shown by "the existence of an indemnity agreement between [supplier] and its customer"); *ActiveVideo Networks, Inc. v. Trans Video Elecs.*, 975 F. Supp. 2d 1083, 1095–96 (N.D. Cal. 2013) (finding subject matter jurisdiction based on plaintiffs' allegations that it "has indemnity obligations with at least thirteen customers" and "often indemnifies its customers pursuant to customer agreements").

Finally, Future Link's statement that "jurisdiction cannot be manufactured through parties' collusion" (D.I. 9 at 8) is a *non sequitur* that bears no relationship to the issues here.

---

[9] Future Link suggests in a footnote that *DataTern* might leave open the possibility that an indemnity obligation alone is not sufficient to establish subject matter jurisdiction. (D.I. 9 at 8 n.1.) Future Link's suggestion mischaracterizes the Federal Circuit's decision. *DataTern* states that, when a supplier's customers have already been sued for patent infringement in one jurisdiction, the supplier may not bring a declaratory judgment action in a different jurisdiction under the first-to-file rule. Those facts are not present here (i.e., Future Link has not sued Intel's customers elsewhere, yet). Indeed, *DataTern* reaffirmed the longstanding rule that indemnity obligations alone can establish subject matter jurisdiction, stating that "[i]f Appellees had an obligation to indemnify their customers, ***they would then have standing to bring suit.***" 2014 WL 1760882, at *3.

There is no collusion, or any basis for Future Link's suggestion there might be.  Future Link's

statement is inappropriate and provides no basis for dismissing Intel's claims.

### B.     Intel's Claims Are Well Pleaded

Future Link also argues that Intel's non-infringement, license, and exhaustion claims

should be dismissed for failure to satisfy the pleading requirements articulated in *Iqbal* and

*Twombly*.[10]  This argument is based on mischaracterizations of the allegations contained in

Intel's Complaint.  Intel's claims are adequately pleaded and satisfy the requirements of *Iqbal*

and *Twombly*.

### 1.     Intel Seeks A Declaratory Judgment That Its Products Containing The Technologies Accused By Future Link Do Not Infringe

Future Link argues that Intel's claims for declaratory judgment of non-infringement

should be dismissed because, according to Future Link, Intel's Complaint does not "specify[] the

particular products for which [Intel] seeks such a declaration." (D.I. 9 at 9.)  In support of that

argument, Future Link insists that Intel "seek[s] a declaration on what appears to be every single

product that Intel offers." (*Id.*)  That is not correct: Intel seeks a declaration that its ***products that***

***contain the particular technologies accused by Future Link in its demand letters*** (*e.g.,* Intel's

chips containing PCI, PCIe, QPI, interconnect testing, thermal sensing, and write-combining

technologies), identified for example in paragraphs 7–14 of the Complaint, do not infringe.

Hence, Future Link's cases involving a failure to identify particular products do not apply.

In a concession that Intel's claims are not directed to every single Intel product, Future

Link makes a back-up argument that the technologies identified in Intel's Complaint are only

mentioned once, in paragraph seven, and are too broad. (D.I. 9 at 10–11.)  But the Intel

---

[10]    Future Link's motion does not contest that Intel's claims for declaratory judgment of invalidity (Counts II, IV, VI, VIII, X, XII, XIV, XVI, XVIII) are well pleaded.

technologies targeted by Future Link's infringement assertions are described throughout nearly five pages of the Complaint after paragraph seven. (*See* D.I. 1 ¶¶ 9–11.) The pages of description ignored by Future Link provide more than sufficient detail to identify the Intel products for which Intel seeks a declaratory judgment of non-infringement.

Intel identified its products with at least as much detail as Future Link did in its demand letters. (*See id.*) Numerous courts have held that a declaratory judgment plaintiff does not need to specify the products for which it seeks a judgment of non-infringement in greater detail than the patentee's own allegations. For example, in *Alien Technology Corp. v. Intermec, Inc.*, the patentee argued that the declaratory judgment plaintiff did not sufficiently state a claim "because [its] complaint does not specifically enumerate the allegedly infringing products." No. 3:06-CV-51, 2007 WL 63989, *7 (D.N.D. Jan. 4, 2007). The court rejected this argument, pointing out that the declaratory judgment complaint referenced "RFID products, which is the technology protected by the patents in issue." *Id.*; *see also Cold Spring Granite Co. v. Matthews Intern. Corp.*, No. 10-4272 (JRT/LIB), 2011 WL 4549407, *2 (D. Minn. Sept. 29, 2011) (denying Rule 12(b)(6) motion to dismiss declaratory judgment counts for non-infringement of "cast bronze products" and explaining that identifying specific products was unnecessary since patentee had accused "cast bronze products").[11]

---

[11] This Court has consistently held that a plaintiff alleging direct infringement need not identify specific products. *See, e.g.*, *Xpoint Techs, Inc. v. Microsoft Corp.*, 730 F. Supp. 2d 349, 353 (D. Del. 2010) ("As this court has previously held, it is not necessary to identify specific products, i.e. model names, but plaintiffs pleadings must mimic Form 18 and identify a general category of products."); *S.O.I.TEC Silicon On Insulator Techs, S.A. v. MEMC Elec. Materials, Inc.*, No. 08-cv-292, 2009 WL 423989, at *2 (D. Del. Feb. 20, 2009) (rejecting challenge to an infringement complaint accusing "silicon on insulator wafers and other engineered semiconductor substrates" of infringement); *Applera Corp. v. Thermo Electron Corp.*, No. Civ.A. 04-1230, 2005 WL 524589, at *1 (D. Del. Feb. 25, 2005) (identifying accused product as "mass spectrometer" was found sufficient). *See also Wistron Corp. v. Phillip M. Adams & Assocs., LLC*, No. C-10-4458, 2011 WL 1654466, at *12 (N.D. Cal.

Future Link's suggestion that Intel "fail[ed] to identify the **customers'** products or systems that are the alleged basis for a declaratory judgment" (D.I. 9 at 11 (emphasis in original)) likewise ignores the allegations in the Complaint. Paragraphs 9–11 of the Complaint use precisely the same terminology used by Future Link in its demand letters. Indeed, those paragraphs quote from Future Link's letters verbatim. (*See, e.g.,* D.I. 1 ¶ 9 ("'Dell products using, and/or supporting the PCI-Express (PCIe) standard'"; "'all Dell Inspiron 15 laptop computers'") (quoting Future Link's demand letter to Dell).)

### 2. Intel's License And Exhaustion Claims Sufficiently Identify The License At Issue

Future Link argues that Intel's license and exhaustion claims are not adequately pleaded, suggesting to the Court that Future Link does not know what license those claims refer to or which products Intel contends are licensed. (D.I. 9 at 12; *see also id.* at 11 ("Intel does not even identify the parties to the alleged agreement").) On the contrary, Intel's Complaint specifically identifies not only the exact date of the license agreement (July 15, 1990), but also that the license agreement was between Intel and "a prior alleged owner of the Patents-in-Suit." (*See* D.I. 1 ¶ 143.) Future Link knows who previously owned the patents it is now asserting and cannot credibly claim it is confused about which license is referred to.[12]

---

Apr. 28, 2011) ("Defendants threatened suit against the Plaintiffs over the patents *sub judice*, [so] we should presume that Defendants know which products infringe."). Instead, "narrowing of issues regarding infringement is 'best achieved through the use of traditional mechanisms of discovery.'" *St. Clair Intellectual Prop. Consultants, Inc. v. Apple, Inc.*, No. 10-cv-982, 2011 WL 4571812, at *2 (D. Del. Sept. 30, 2011).

[12] Indeed, the parties discussed the July 15, 1990 license between Intel and the former owner of the patents-in-suit as part of the parties' negotiations over the Court's Case Management Checklist in advance of the upcoming August 4, 2014 Case Management Conference, leaving no doubt about Future Link's awareness of the license referred to in the Complaint.

Also lacking merit is Future Link's contention that "[t]he complaint does not limit the [license-related] request to specific Intel products," and that Intel's license and exhaustion claims "are not limited to specific products or product categories, but refer to all Intel products." (D.I. 9 at 12.) Intel's license claim explains that "Future Link's infringement assertions and license demands are based at least in part on, and on their face encompass, the alleged making, use, sale, offer for sale, or importation of *licensed Intel products*" (D.I. 1 ¶ 143), thereby specifically identifying the licensed Intel products as those targeted by Future Link's assertions, *i.e.*, Intel's chips containing the PCI, PCIe, QPI, interconnect testing, thermal sensing, and write-combining technologies accused by Future Link.

## VI.    CONCLUSION

Intel's Complaint pleads facts sufficient to support multiple, independent bases for jurisdiction, including allegations of direct infringement, indirect infringement, and indemnity obligations.  Intel's claims are well-pleaded and sufficiently detailed, identifying the products and license agreement at issue.  Accordingly, Future Link's motion to dismiss should be denied.[13]  In the event that Future Link's motion to dismiss is granted in any part, Intel requests that the dismissal be without prejudice and that Intel be given leave to amend.

---

[13] Future Link cites *Terra Nova* (D.I. 9 at 13) for the proposition that courts have inherent authority to decline jurisdiction.  But the four factors articulated in *Terra Nova* ("(1) the likelihood that [a federal court] declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies") favor this Court exercising jurisdiction over Intel's claims.  *Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213, 1222–1225 (3d Cir. 1989).  And dismissing this action would be contrary to the purpose of the Declaratory Judgment Act because dismissal would deprive Intel of an opportunity to resolve the cloud over Intel's products created by Future Link's assertions and licensing demands. S*ee, e.g.*, *EchoStar Satellite LLC v. Finisar Corp.*, 515 F. Supp. 2d 447, 452 (D. Del. 2007) ("In exercising this discretion, courts must be mindful that the purpose of the Act is to allow alleged infringers relief from uncertainty and delay.").

By:   /s/ Jack B. Blumenfeld
    Jack B. Blumenfeld (#1014)
    Maryellen Noreika (#3208)
    MORRIS, NICHOLS, ARSHT & TUNNELL
    LLP
    1201 North Market Street
    P.O. Box 1347
    Wilmington, DE 19899
    (302) 658-9200
    jblumenfeld@mnat.com
    mnoreika@mnat.com

    *Attorneys for Plaintiff*

OF COUNSEL:

Gregory S. Arovas, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
(212) 446-4800

Adam Alper
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94194
(415) 439-1400

Michael W. De Vries
KIRKLAND & ELLIS LLP
333 S. Hope Street
Los Angeles, CA 90071
(213) 680-8400

July 30, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on July 30, 2014, upon the following in the manner indicated:

Brian E. Farnan, Esquire                               *VIA ELECTRONIC MAIL*
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*

Ben Hattenbach, Esquire                                *VIA ELECTRONIC MAIL*
Melissa McCormick, Esquire
Kevin Kiley, Esquire
IRELL & MANELLA LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
*Attorneys for Defendant*

/s/ Jack B. Blumenfeld

_____
Jack B. Blumenfeld (#1014)