# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

INTEL CORPORATION,                )
                                  )
       Plaintiff,                 )
                                  )
v.                                )     Civil Action No. 14-377-LPS
                                  )
FUTURE LINK SYSTEMS, LLC,         )
                                  )
       Defendant.                 )

## REPORT AND RECOMMENDATION

Presently before the Court is Defendant Future Link Systems, LLC's ("Defendant" or

"Future Link") Motion to Dismiss ("Motion to Dismiss"), which seeks dismissal of Plaintiff Intel

Corporation's ("Plaintiff" or "Intel") Complaint on various grounds. (D.I. 8)  For the reasons set

forth below, the Court recommends that Defendant's Motion to Dismiss be GRANTED-IN-

PART.

## I.    BACKGROUND

### A.    The Parties

Intel is a Delaware corporation with its principal place of business in Santa Clara,

California. (D.I. 1 at ¶ 2)  Future Link is a limited liability corporation organized under the laws

of Delaware. (*Id.* at ¶ 3)  Future Link is the owner of the nine asserted United States Patents,

which include U.S. Patent Nos. 5,608,357 ("the '357 patent"), 5,870,570 ("the '570 patent"),

6,008,823 ("the '823 patent"), 6,108,738 ("the '738 patent"), 6,606,576 ("the '6576 patent"),

6,622,108 ("the '108 patent"), 6,636,166 ("the '166 patent"), 6,920,576 ("the '0576 patent"), and

7,478,302 ("the '302 patent") (collectively, "the Future Link patents"). (*Id.* at ¶ 8)

### B.    Procedural Background

On March 24, 2014, Intel commenced this action, seeking a declaratory judgment that it does not infringe each of the Future Link patents directly or indirectly, that the Future Link patents are invalid, that it has a license to practice at least five of the Future Link patents,[1] and that Future Link's claims with respect to the same five patents are barred by the doctrine of patent exhaustion. (*Id.* at ¶¶ 25-151) On June 13, 2014, Future Link filed the instant Motion to Dismiss. (D.I. 8) On July 15, 2014, Chief Judge Leonard P. Stark referred that motion to the Court for resolution. (D.I. 14) On November 20, 2014, the Court heard oral argument on the Motion to Dismiss. (D.I. 66, hereinafter "Tr.")[2]

## C. Relevant Allegations and Evidence Regarding the Motion to Dismiss

On April 15, 2013, Future Link's Managing Director Brian Marcucci sent a letter to Dell Inc.'s ("Dell") Legal Department (the "Dell Letter"). (D.I. 1 at ¶ 9; D.I. 16, ex. 1) This letter accused Dell of infringing each of the nine Future Link patents based on Dell's use and incorporation of features and functionalities covered by the patents. (D.I. 16, ex. 1 at 1) Enclosed along with the Dell Letter were two tables, which listed each of the assertedly infringed Future Link patents, as well as the Dell "Representative Products" that allegedly were used to infringe each of the patents. (*Id.* at 2-4) For example, with respect to the '570 patent, the table listed the following "Representative Products":

---

[1]       Specifically, the five patents at issue as to the license claim are the '357, '570, '823, '738, and '108 patents. (D.I. 1 at ¶ 143)

[2]       Subsequent to oral argument, Intel filed a supplemental statement in opposition to the Motion to Dismiss, (D.I. 74), which prompted Future Link to file a response to that statement, (D.I. 76), which prompted Intel to file a reply, (D.I. 79), which prompted Future Link to file a response to that reply, (D.I. 80). These documents, all of which contain extensive argument and none of which were filed with the Court's approval, are in violation of Local Rule 7.1.2(b) and will be disregarded. D. Del. LR 7.1.2(b).

> All Dell OptiPlex 580 series computers using and/or containing
> AMD SB7x0 Southbridge devices. All Dell products (including
> desktop, laptop and server products) using and/or containing AMD
> SB7x0, SB8x0 or AMD SB9x0 Southbridge devices. All other
> Dell products using and/or containing Southbridge devices that
> incorporate multi-function PCI device capability into a single
> integrated circuit. All other Dell products incorporating multi-
> function PCI device capability into a single integrated circuit. All
> other products incorporating multi-function PCI device capability
> into a single integrated circuit.

(*Id.* at 2) The accused Dell "Representative Products" for the eight other Future Link patents

included: (1) "products using and/or supporting the PCI-Express (PCIe) standard[]"; (2)

products containing "DDR3 SDRAM, DDR3 SDRAM memory modules, and/or GDDR5

SGRAM[]"; and (3) "products using and/or containing a processor that incorporate[s] multiple

thermal sensors into a processor core, such as a central processing unit (CPU) or graphics

processing unit (GPU)[.]" (D.I. 1 at ¶ 9; D.I. 16, ex. 1 at 2-4) In addition to these broad

categories of products, the allegations also identified specific Dell products (e.g., "Dell Inspiron

15 laptop computers") that were alleged to be used to infringe each of the various Future Link

patents. (D.I. 1 at ¶ 9; D.I. 16, ex. 1 at 2-4)

The tables' list of Dell "Representative Products" as to the '0576 patent was unique. This

was the only instance wherein Future Link identified by name specific Intel components of the

accused Dell products at issue. The accusations for the '0576 patent identify the following as

"Representative Products":

> All Dell PowerEdge R910 severs. All Dell PowerEdge series
> servers that support *at least 2 Intel Xeon 5500, 5600, E5 or E7
> series processors*. All other Dell desktop, workstation, and server
> products using and/or supporting *QuickPath Interconnect (QPI)*.
> All other Dell products using and/or supporting *QuickPath
> Interconnect (QPI)*. All other products using and/or supporting

3

*QuickPath Interconnect (QPI).*

(D.I. 16, ex. 1 at 4 (emphasis added)) "QuickPath Interconnect" is identified as "Intel's QuickPath Interconnect" in the Complaint, and is described therein as a "technolog[y] supplied by Intel." (D.I. 1 at ¶ 7) Although the remaining listing of "Representative Products" do not identify any Intel components, they do at times identify by name certain Advanced Micro Devices, Inc. ("AMD") and NVIDIA Corporation ("NVIDIA") components that are part of certain accused Dell products. (D.I. 16, ex. 1 at 2-4)

On April 15, 2013, Mr. Marcucci also sent a letter (the "HP Letter") to the Executive Vice President and General Counsel of Hewlett-Packard Company ("HP"). (D.I. 1 at ¶ 10; D.I. 16, ex. 2 at 1) The HP Letter accused certain HP products of infringing eight of the nine Future Link patents through the incorporation of features and functionalities allegedly covered by these eight patents.[3] (D.I. 16, ex. 2 at 1) The HP Letter also included a table containing a list of "Representative Products" that were said to infringe the eight Future Link patents; that table identifies specific HP product models and, more broadly, general HP product categories. (*Id.* at 2-3) As with the Dell Letter, the table accompanying the HP Letter identifies "AMD" or "NVIDIA" products or components contained within the allegedly infringing HP products. (*Id.*) But unlike the Dell Letter, that table never identifies by name any "Intel" products or components. (*Id.*)

During June 2013, Future Link also sent a letter (the "Promise Letter") to Promise Technology, Inc. ("Promise"), accusing Promise of infringing five of the nine Future Link patents

---

[3]     The only Future Link patent not included in the allegations against HP was the '302 patent. (D.I. 16, ex. 2 at 2-3)

(the '357 patent, the '6576 patent, the '108 patent, the '166 patent, and the '0576 patent). (D.I. 1 at ¶ 11; D.I. 16, ex. 3) As with the Dell Letter and the HP Letter, the Promise Letter included a table identifying specific Promise products, as well as general Promise product categories, that were said to be used to infringe the five Future Link patents. (D.I. 16, ex. 3) The table enclosed with the Promise Letter does not identify by corporate name any manufacturers of any of the components of Promise's accused products. (*Id.*)

In the Complaint, in addition to referencing the allegations in these letters listed above, Intel alleges that:

> Intel manufactures and sells components that are the subject of Future Link's accusations against Dell, HP, and Promise . . . and [] has engaged in meaningful preparations to continue manufacturing and selling such components. Intel customers including Dell, HP, and Promise have incorporated and continue to incorporate such components into their products, including the products [referenced in the Dell Letter, HP Letter and Promise Letter].

(D.I. 1 at ¶ 12) It further alleges that:

> Intel has received indemnity demands from its customers based on Future Link's patent infringement accusations, and Intel's customers continue to seek indemnity from Intel in connection with Future Link's assertions. Intel is obligated to indemnify its customers for third-party patent infringement claims in accordance with the terms of the respective agreements governing sales to those customers.

(*Id.* at ¶ 14)[4]

---

[4] With respect to its license and exhaustion allegations, Intel also alleges that "[o]n or about July 15, 1990, a prior alleged owner of the Patents-in-Suit entered into a license agreement with Intel that provides a license to Intel with respect to at least the '357, '570, '823, '738, and '108 patents." (D.I. 1 at ¶ 143) Intel asserts that Future Link's infringement allegations regarding these patents are barred by this license agreement. (*Id.*) Likewise, Intel asserts that the license bars Future Link's allegations under the doctrine of patent exhaustion. (*Id.* at ¶ 148)

## II.    DISCUSSION

Future Link makes a number of different arguments in its Motion to Dismiss: (1) that the

Complaint should be dismissed for lack of subject matter jurisdiction, pursuant to Federal Rule

of Civil Procedure 12(b)(1), as Intel does not have standing to bring the declaratory judgment

claims at issue; (2) that Intel's claims regarding direct and indirect non-infringement should be

dismissed for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6); (3)

that Intel's claims regarding a license defense and the doctrine of patent exhaustion also fail to

state a claim pursuant to Rule 12(b)(6); and (4) that the Court should exercise its inherent

authority under the Declaratory Judgment Act to dismiss the suit. The Court will address each of

these arguments below.

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

#### 1.    Legal Standard

Rule 12(b)(1) authorizes dismissal of a complaint for lack of subject matter jurisdiction.

"Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially (based on the

legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact)."

*Kuhn Constr. Co. v. Diamond State Port Corp.*, Civ. No. 10-637-SLR, 2011 WL 1576691, at *2

(D. Del. Apr. 26, 2011). "In reviewing a facial attack, the court must only consider the

allegations of the complaint and documents referenced therein and attached thereto, in the light

most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir.

2000). "In reviewing a factual attack, the court may consider evidence outside the pleadings."

*Id.* There is no dispute here that Future Link's attack is a facial one, as it focuses on the

allegations in Intel's Complaint and why those allegations assertedly do not give rise to subject

matter jurisdiction. (D.I. 9; D.I. 15 at 6 n.4; *id.* at 15 n.8; Tr. at 12, 60-61)

The Declaratory Judgment Act requires that a "case of actual controversy" exist between the parties before a federal court may exercise jurisdiction. 28 U.S.C. § 2201(a). In determining whether there is subject matter jurisdiction over declaratory judgment claims, a court should ask "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks and citation omitted) (noting that the Declaratory Judgment Act's requirement that a "'case of actual controversy'" exist is a reference to the types of cases and controversies that are justiciable under Article III); *see also Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1335-36 (Fed. Cir. 2008). A case or controversy must be "based on a *real* and *immediate* injury or threat of future injury that is *caused by the defendants*—an objective standard that cannot be met by a purely subjective or speculative fear of future harm." *Prasco, LLC*, 537 F.3d at 1339 (emphasis in original). Thus, in the patent context, "jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee." *Id.* (internal quotation marks and citation omitted). When the conduct of the patentee can be "reasonably inferred as demonstrating intent to enforce a patent" against the declaratory judgment plaintiff, subject matter jurisdiction will arise, even when that intent is demonstrated implicitly. *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363-64 (Fed. Cir. 2009).

A decision as to whether an actual controversy exists in the context of a patent

7

declaratory judgment claim "will necessarily be fact specific and must be made in consideration of all the relevant circumstances." *W.L. Gore & Assocs., Inc. v. AGA Med. Corp.*, Civil No. 11-539 (JBS-KMW), 2012 WL 924978, at \*4 (D. Del. Mar. 19, 2012) (citing *MedImmune, Inc.*, 549 U.S. at 127). The burden is on the party asserting declaratory judgment jurisdiction (here, Plaintiff) to establish that an Article III case or controversy existed at the time that the claim for declaratory relief was filed and that it has continued since. *Danisco U.S. Inc. v. Novozymes A/S*, 744 F.3d 1325, 1329 (Fed. Cir. 2014); *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, Civ. No. 12-1301-SLR, 2013 WL 1856308, at \*2 (D. Del. May 2, 2013). "It is well-established that, in patent cases, the existence of a case or controversy must be evaluated on a claim-by-claim basis." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1281 (Fed. Cir. 2012) (internal quotation marks and citation omitted).

## 2. Future Link's Accusations Against Intel's Customers

### a. *Arris* and *DataTern*

Intel's first theory as to why subject matter jurisdiction exists relates to the infringement allegations Future Link made against Intel's customers Dell, HP and Promise.[5] In reviewing Intel's arguments, the Court is guided primarily by two Federal Circuit cases prominently cited

---

[5]     Although the Court's analysis in this subsection focuses on Future Link's theories of patent infringement and on Intel's non-infringement claims, the United States Court of Appeals for the Federal Circuit has treated declaratory judgment claims regarding non-infringement and invalidity as rising and falling together. *See generally 3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1377-81 (Fed. Cir. 2012) (analyzing whether subject matter jurisdiction existed as to claims seeking a declaration of non-infringement and invalidity, and considering the same arguments in determining that an ongoing case or controversy existed); *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1377-83 (Fed. Cir. 2007) (same). Thus, to the extent that an actual controversy exists as to certain declaratory judgment claims for non-infringement regarding a patent-in-suit, a controversy also exists as to invalidity of that patent.

8

by the parties: *Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368 (Fed. Cir. 2011) and *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014) (*"DataTern"*).

In *Arris*, the Federal Circuit addressed whether there was subject matter jurisdiction over declaratory judgment claims of Arris Group, Inc. ("Arris"). Arris brought the claims against British Telecommunications, PLC ("BT"), based on BT's accusations that Cable One (Arris' customer) infringed the patents-in-suit by using equipment purchased from Arris in order to implement Voice over Internet Protocol ("VoIP") services on Cable One's network. 639 F.3d at 1371-73. Prior to the suit, BT sent a 118-page presentation to Cable One, which asserted that Cable One's VoIP network infringed various claims of the patents. *Id.* at 1372. In that presentation, BT "specifically and repeatedly identified Arris' [products] used in Cable One's network as embodying numerous elements and performing numerous method steps of the asserted claims." *Id.* Cable One subsequently informed Arris of the allegations and demanded indemnification. *Id.* As a result, representatives from BT, Cable One and Arris later met on multiple occasions at Arris' offices; at these meetings, BT reviewed its infringement contentions, Arris attempted to rebut those contentions as they related to Arris' products, and the parties discussed a potential Cable One license. *Id.* Thereafter, BT and Arris continued to have written and telephonic communications, in which the two entities further discussed Arris' non-infringement arguments. *Id.* Although BT later sent copies of a Cable One license proposal to Arris and Cable One, no license agreement was ever consummated prior to suit. *Id.* at 1372-73.

The *Arris* Court, in resolving the issue, noted that "where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action" if, *inter alia*, "there is a controversy

9

between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers." *Id.* at 1375. BT disputed that such a controversy existed with Arris, noting that it had never specifically referenced Arris' own direct or indirect infringement during the parties' many conversations. *Id.* at 1376. But the Federal Circuit found that BT's 118-page presentation of infringement contentions "paint[ed] a different picture." *Id.* The *Arris* Court noted that although the presentation did not explicitly accuse Arris of contributory infringement, it: (1) "explicitly and repeatedly singled out Arris' products used in Cable One's network to support its infringement contentions[;]" (2) "identified Arris' [] products as embodying numerous elements and performing [all or nearly all of] numerous method steps of the asserted claims" such that they were being used as a material part of the allegedly infringed invention; (3) specifically referenced Arris products or product literature on 26 pages of the presentation; and (4) alleged that Arris' products were designed in such a way that they were especially made or adapted for a use that infringed the patents-in-suit, and were not staple articles or commodities of commerce suitable for substantial non-infringing use. *Id.* at 1376-78. Overall, the "presentation made it clear that Cable One's use of Arris' [products] was central to BT's infringement contentions." *Id.* at 1377. This, along with the fact that Arris was "directly and substantially involved in BT's infringement and licensing negotiations" and was the recipient of "direct and repetitive" communications from BT as to BT's infringement contentions, all prompted the *Arris* Court to find that declaratory judgment jurisdiction existed. *Id.* at 1378-79.

In *DataTern*, the Federal Circuit addressed similar issues to those considered in *Arris*. DataTern, Inc. ("DataTern") had previously sued several of Microsoft Corporation's

10

("Microsoft"), SAP AG and SAP America, Inc.'s (collectively, "SAP") customers, alleging infringement of both of the patents-in-suit. 755 F.3d at 902. DataTern had sent these customers claim charts alleging infringement based on the customers' use of SAP's and Microsoft's software products; the claim charts referred extensively to SAP and Microsoft functionality. *Id.* With respect to SAP, the claim charts as to both patents cited "to SAP-provided [product] user guides and documentation for each element of the representative claims." *Id.* With respect to Microsoft, for the first patent (the "'502 patent"), the claim charts cited to "Microsoft-provided [product] online documentation for each element of the representative claims." *Id.* For the second patent (the "'402 patent"), however, the claim charts cited only to third-party documentation (that is, documentation not provided by Microsoft) for several claim limitations. *Id.*

In assessing whether subject matter jurisdiction existed over SAP's and Microsoft's declaratory judgment claims, the *DataTern* Court found it "incorrect" to assume that a supplier has an automatic "right to bring [a] declaratory judgment action solely because their customers have been sued for direct infringement." *Id.* at 904. It explained that there was no allegation in the case that Microsoft or SAP were liable for direct infringement; as to indirect infringement, it required Microsoft and SAP to point to "allegations by the patentee or other record evidence that establish at least a reasonable potential that such a claim could be brought." *Id.* at 904-05.

Ultimately, the Federal Circuit held that there was subject matter jurisdiction over SAP's claims as to both patents-in-suit. There the *DataTern* Court noted that the claim charts "provided to the SAP customers allege direct infringement of the [patents] based on SAP's customers' use of [particular SAP software]" and cited to "SAP-provided user guides and documentation for

11

each claim element." *Id.* at 905. Thus, since the charts "show that SAP provides its customers with the necessary components to infringe [the patents-in-suit] as well as the instruction manuals for using the components in an infringing manner" SAP had established that a substantial controversy existed as to whether it induced infringement. *Id.* Subject matter jurisdiction also existed for Microsoft's claims regarding the '502 patent, as the "claim charts cite to Microsoft-provided online documentation for each limitation of [that patent's] representative claims." *Id.* But with respect to Microsoft's claims regarding the '402 patent, the *DataTern* Court held that subject matter jurisdiction did not exist. The Federal Circuit explained that because the claim charts as to this patent "cite exclusively to third-party . . . documentation for several key claim limitations" they did not "impliedly assert that Microsoft induced [the direct] infringement" at issue. *Id.* Likewise, with respect to contributory infringement, the *DataTern* Court found that the claim charts did not impliedly assert that Microsoft's product was not a staple article or commodity of commerce suitable for substantial non-infringing use. *Id.* at 906.[6]

With the holdings of *Arris* and *DataTern* thus in mind, the Court addresses whether there is a justiciable controversy with respect to the patents-in-suit, as to Intel's claims regarding direct and indirect non-infringement. At the outset, the Court notes that there is no allegation here that Future Link ever communicated directly with Intel in any way, nor that Future Link ever directly threatened Intel with suit. (*See* D.I. 9 at 3) If subject matter jurisdiction exists as to some or all of these claims, it must emanate from implicit threats that Future Link made to Intel by way of its

---

[6]        The *DataTern* Court also distinguished the decision in *Arris* from the circumstances relating to Microsoft's declaratory judgment claim regarding the '402 patent. Unlike the situation in *Arris*, in the only instance when DataTern and Microsoft communicated prior to the filing of the suit at issue, DataTern assured Microsoft that it did *not* intend to sue Microsoft. *Id.*

12

communications to Intel's customers in the Dell, HP and Promise Letters.[7]

The allegations regarding the '0576 patent, in the Court's view, raise substantially different issues than those regarding the other Future Link patents. Therefore, the '0576 patent will be addressed separately and will be taken up first.

### b. The '0576 Patent

The '0576 patent contains 21 claims, 18 of which are directed towards a "parallel data communication arrangement[,]" that is, a product or apparatus claim. (D.I. 1, ex. 8 at 8:17-10:49) The remaining three claims are directed toward a "parallel data communication method[.]" (*Id.*)

Again, Future Link's infringement accusations against Dell here were that "[a]ll Dell PowerEdge series servers that support *at least 2 Intel Xeon 5500, 5600, E5 or E7 series processors*" were used to infringe the '0576 patent. (D.I. 16, ex. 1 at 1, 4 (emphasis added)) Additionally, its accusations against each of Dell, HP, and Promise identified products "using and/or supporting QuickPath Interconnect (QPI)" as infringing this patent. (*Id.*; *see also* D.I. 16, ex. 2 at 3; *id.*, ex. 3 at 1) As to the latter allegations, the Court can reasonably infer that QuickPath Interconnect is a proprietary Intel technology, since in the Complaint, Intel described it as "*Intel's* QuickPath Interconnect" and used other words to that effect. (D.I. 1 at ¶ 7 (emphasis added); *see, e.g., id.* at ¶ 9 ("Regarding the '0576 [P]atent, Future Link alleges, *inter alia*, that . . . '[a]ll other products using and/or supporting [Intel] QuickPath Interconnect (QPI)'

---

[7]    Since these letters are referred to in great detail in the Complaint, (D.I. 1 at ¶¶ 9-11), the Court may take their content into account in reviewing this facial challenge to jurisdiction.

are 'representative' infringing products.") (brackets used in original))[8]

With these allegations in mind, the Court next considers whether Intel has alleged sufficient facts to allow for subject matter jurisdiction under each theory of non-infringement.

### (1) Direct infringement

For Future Link's accusations to give rise to a declaratory judgment claim regarding direct non-infringement of the '0576 patent, the facts alleged in the Complaint and the documents referenced therein must imply that Intel itself may be liable for direct infringement. That is, as to direct infringement, Intel must be said to have itself been "mak[ing], us[ing], offer[ing] to sell, . . . sell[ing,] . . . or import[ing] into the United States any patented invention[.]" 35 U.S.C. § 271(a).[9]

With respect to the 18 "arrangement" claims (claims 1-16 and 20-21), a reasonable, objective view of Future Link's words and actions demonstrate an implied assertion of rights against Intel in this regard. Future Link accused the three Intel customers of directly infringing by incorporating and using features and functionalities covered by the Future Link patents. (D.I. 1 at ¶¶ 9-11; D.I. 16, ex. 1 at 1; D.I. 16, ex. 2 at 1) As to the accusations against Dell, although Future Link initially accuses a specific Dell product line (the "Dell PowerEdge R910 servers"), the accusations become progressively broader, next targeting "all Dell PowerEdge series servers

---

[8]     During oral argument on this Motion to Dismiss, Future Link's counsel acknowledged that QuickPath Interconnect is, in fact, a proprietary Intel technology, but asserted that this fact was outside of the record. (Tr. at 13) For the reasons expressed above, the Court disagrees.

[9]     Again, Intel has specifically alleged that it "manufactures and sells components that are the subject of Future Link's accusations against Dell, HP, and Promise . . . and Intel has engaged in meaningful preparations to continue manufacturing and selling such components." (D.I. 1 at ¶ 12)

14

that support" specific Intel components utilizing QuickPath Interconnect technology, then "[a]ll other Dell desktop, workstation, and server products using and/or supporting QuickPath Interconnect" and then "[a]ll other Dell products using and/or supporting QuickPath Interconnect[.]" (D.I. 16, ex. 1 at 4) The accusations against HP and Promise are similar, in that they initially accuse a single product, and then broaden to accuse all products using or supporting QuickPath Interconnect. (*Id.*, ex. 2 at 3; *id.*, ex. 3 at 1) This repeated, explicit focus on Intel's proprietary technology suggests that it can be "reasonably inferred[,]" *Hewlett-Packard Co.*, 587 F.3d at 1363, that Future Link is accusing these customers' products of infringing the "arrangement" claims solely due to those products' utilization of Intel components (i.e., processors). (*See* D.I. 1, ex. 8 at 4:12-17, 8:6-9 (explaining embodiments of the invention that are related to chips or chip-sets); *cf.* Tr. at 55 (Intel's counsel, speaking about many of the claims as to many of the patents-in-suit, and asserting that "the claim itself is going to be contained within a chip"))

Therefore, since it is reasonable to infer that Future Link has accused Dell, HP, and Promise of infringement based solely on the use and sale of Intel components, there is necessarily an implied accusation that Intel itself has also directly infringed the 18 arrangement claims. This is because Intel, in both making these components and selling them to its three customers, would have been performing its own independent acts of infringement (assuming that these components are, in fact, infringing). *See* 35 U.S.C. § 271(a).[10]

---

[10] Future Link claims that *Arris* and *DataTern* stand for the proposition that a declaratory judgment supplier plaintiff can never have standing to sue a patentee for direct non-infringement, based solely on the nature of the patentee's accusations against the supplier's customers. (*See* D.I. 19 at 3-4) The Court cannot agree. In both *Arris* and *DataTern*, the declaratory judgment supplier plaintiff simply never argued that the nature of the patentee's

15

With respect to the method claims (claims 17-19), the Court finds that the accusations against Dell, HP, and Promise do not give rise to an actual controversy. Although the accusations generally identify the customers' products' "features and functionalities" as infringing (such as those utilizing or supporting QuickPath Interconnect) they do not further explain how any of the method claims are actually said to be infringed (indeed, Future Link's letters do not break out their allegations on a claim-by-claim basis at all).[11] (D.I. 16, ex. 1 at 1, 4) Unlike with the "arrangement" claims, only if Intel itself performed every step of these three method claims would Intel be responsible for direct infringement of the claims. In the absence of any allegations in Future Link's letters or in the Complaint as to how the steps of the method at issue are said to be performed (or what entity it is that is asserted to be doing the performing), the Court cannot find that there is a "reasonable potential" that Future Link would bring a claim of infringement against Intel as to claims 17-19 of the patent. *DataTern*, 755 F.3d at 905.

---

accusations against the customer gave rise to an implicit claim of direct infringement against it; thus, in the two cases, the Federal Circuit was not really addressing this issue. *DataTern*, 755 F.3d at 903-04; *Arris*, 639 F.3d at 1375. Moreover, as this Court has noted, "[i]t is entirely possible that a customer and vendor can both directly infringe a patent based on the same conduct." *Microsoft Corp. v. GeoTag, Inc.*, Civil Action No. 11-175-RGA, 2014 WL 4312167, at *2 (D. Del. Aug. 29, 2014) (noting that during prior litigation initiated by the defendant patentee against customers of the declaratory judgment supplier plaintiffs, the patentee "could just as easily have asserted a claim of direct infringement against [suppliers, including plaintiffs], based on the same underlying circumstances in the customer suits. An express accusation [of direct infringement] by [the patentee] was unnecessary."). There could well be situations, particularly regarding a patent claim covering a product, system, or apparatus, where a patentee clearly accuses a customer of direct infringement of a claim solely due to the use or sale of a component purchased from a manufacturer supplier. Depending on the surrounding circumstances, that accusation might indeed amount to an implied assertion of direct infringement by the supplier, as it does here.

[11]     Unlike with a product claim, making or selling a product that is capable of infringing does not infringe a method claim. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).

Accordingly, Intel has alleged an actual controversy with respect to direct infringement of claims 1-16 and 20-21 of the '0576 patent. Intel has not, however, alleged an actual controversy with respect to direct infringement of claims 17-19 of the '0576 patent.

### (2) Induced infringement

With respect to induced infringement, the allegations must imply liability on behalf of Intel by suggesting that Intel took "an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *DataTern*, 755 F.3d at 904 (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2068 (2011)). An accusation would sufficiently suggest such encouragement if, for example (as in *DataTern*), the indirect infringer was asserted to have provided the direct infringer with "instruction manuals for using the [indirect infringer's] components in an infringing manner." *Id.* at 905.

Here, there are absolutely no allegations referenced in the Complaint (nor in the Dell Letter, the HP Letter or the Promise Letter) suggesting that Intel encouraged infringement of any of the claims of the '0576 patent. Simply selling products to customers who may be using the products in an infringing way does not, in and of itself, amount to induced infringement. *Id.* at 904. And ultimately, this is all that can be inferred about Intel's conduct after reviewing the Complaint and these three accusatory letters. Accordingly, the Court finds that there is no actual controversy as to induced infringement of the '0576 patent.

### (3) Contributory infringement

Under 35 U.S.C. § 271(c), a patentee must demonstrate that an alleged contributory infringer has sold, offered to sell or imported into the United States "a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in

17

practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use[.]" The sale of a component without a substantial non-infringing use, even when included in a product that, as a whole, does have a substantial non-infringing use, constitutes contributory infringement. *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1336-40 (Fed. Cir. 2008).

With respect to all of the claims of the '0576 patent, the allegations are insufficient to give rise to an actual controversy of contributory infringement, if for no other reason than they do not sufficiently establish that the Intel processors at issue are not "staple article[s] or commodit[ies] of commerce suitable for substantial noninfringing use[.]" 35 U.S.C. § 271(c). To establish a "reasonable potential" that a contributory infringement allegation could be brought, there must be at least some suggestion that Intel's components are "'good for nothing else'" but infringement, such that they have no substantial noninfringing use. *Ricoh Co., Ltd.*, 550 F.3d at 1337 (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005)). There are no such allegations in Future Link's letters, nor in Intel's Complaint. In the absence of any nod toward that element, the Court is unprepared to infer that the allegations as to that element are sufficient. *See Adobe Sys. Inc. v. Kelora Sys. LLC*, No. C. 11-3938 CW, 2011 WL 6101545, at *5 (N.D. Cal. Dec. 7, 2011) (finding no subject matter jurisdiction over declaratory judgment plaintiff's contributory infringement claims where it did not allege or point to allegations that its products cannot be used without infringing the patent-in-suit).

For the foregoing reasons, the Court finds that Intel has not established declaratory judgment jurisdiction as to contributory infringement of the '0576 patent.

18

### c. The Additional Future Link Patents

Although the nature of Future Link's accusations regarding each of the remaining Future Link patents differ, these differences are not material for purposes of analyzing subject matter jurisdiction. Accordingly, Intel's declaratory judgment claims as to each of these patents will be analyzed together.

### (1) Direct infringement

As previously discussed, in order for the Court to find subject matter jurisdiction for Intel's declaratory judgment claim of direct non-infringement, Future Link's accusations against Intel's customers must have implied or suggested that Intel was directly infringing the patents in suit (e.g., by selling infringing products). Here, by way of example, the Court will assess Future Link's accusations in the Dell Letter for each of the remaining eight patents, as they are also illustrative of Future Link's accusations in the HP Letter and Promise Letter.

In the tables attached to the Dell Letter, Future Link pointed to particular Dell product models, as well as to products containing certain functionality or components, as infringing these eight patents. (D.I. 16, ex. 1 at 2-4) These included references to "Dell products using and/or containing Southbridge devices that incorporate multi-function PCI device capability into a single integrated circuit[,]" "Dell products incorporating multi-function PCI device capability into a single integrated circuit[,]" "Dell products using and/or supporting the PCI-Express (PCIe) standard[,]" "Dell products containing, using and/or incorporating DDR3 SDRAM, DDR3 SDRAM memory modules, and/or GDDR5 SGRAM[,]" "Dell products using and/or containing a processor that incorporate[s] multiple thermal sensors into a processor core," or "Dell Inspiron 15 laptop computers." (*Id.*; *see also* D.I. 1 at ¶ 9). Yet while certain of these accusations

19

specifically identified third-party components (i.e., AMD or NVIDIA components) included in the allegedly infringing Dell products, none specifically called out Intel or its products by name. Nor did the accusations specify proprietary Intel technology (such as QuickPath Interconnect) included in the Dell products. Thus, as to these eight patents, in order for Intel to build an understandable bridge to subject matter jurisdiction, it must heavily rely on the Complaint's additional allegations that Intel "manufactures and sells components that are the subject of Future Link's accusations against Dell, HP, and Promise" and that "Intel['s] customers including Dell, HP, and Promise have incorporated and continue to incorporate such components into their products, including the [products referenced above]." (D.I. 1 at ¶ 12)

The Court concludes that Intel's allegations are insufficient. Here, at most these allegations indicate that (1) Intel's customers have been accused of infringement, and (2) Intel produces at least some (unspecified number of) "components" that are the subject of these accusations. (*Id.* at ¶¶ 9-12) But unlike in *Arris* or *DataTern*, here there are: (1) no allegations that Future Link had ever directly accused Intel of infringement of these eight patents; (2) no allegations that Future Link ever communicated with Intel regarding Intel's role in Dell, HP or Promise's asserted acts of infringement; and (3) again, no allegations that Future Link specifically listed Intel's own products by name when discussing its customers' alleged infringement of the patents.

Intel's argument seems to be that since Future Link accused "all" of certain Dell/HP/Promise products that contain certain generic components, then if Intel simply alleges that it produces *any* amount of such components for Dell, HP or Promise, subject matter jurisdiction exists for Intel's claims. (Tr. at 44-45) Yet it has not cited a case standing for such a

20

broad proposition. And the Court is hesitant to open the jurisdictional floodgates so widely on so thin a reed. Here, as an objective matter, even granting that Intel "manufactures and sells components that are the subject of Future Link's accusations against Dell, HP, and Promise[,]" (D.I. 1 at ¶ 12), it is not clear enough that Future Link's accusations placed *Intel's* conduct in controversy.

During oral argument on the Motion to Dismiss, in order to explain why Intel felt declaratory judgment jurisdiction *was* clear, Intel's counsel focused, by way of example, on the accusations in the Dell Letter as to the '570 patent. Again, those accusations list representative infringing products as:

> All Dell OptiPlex 580 series computers using and/or containing AMD SB7x0 Southbridge devices. All Dell products (including desktop, laptop and server products) using and/or containing AMD SB7x0, SB8x0 or AMD SB9x0 Southbridge devices. All other Dell products using and/or containing Southbridge devices that incorporate multi-function PCI device capability into a single integrated circuit. All other Dell products incorporating multi-function PCI device capability into a single integrated circuit. All other products incorporating multi-function PCI device capability into a single integrated circuit.

(D.I. 16, ex. 1 at 2) Intel's counsel then asserted that: (1) "[e]very [Dell] computer is going to have a [micro]processor in a Southbridge chip[]"; (2) "Intel is far and away the largest supplier of microprocessors in the Southbridge chips[]"; (3) "Dell is our largest customer" such that "[w]e have the largest market share with Dell[]"; (4) "[f]or some product lines, [Dell is] an almost exclusive user of Intel technology[]" and "between AMD and Intel, you pretty much have a two supplier market[]"; such that (5) "[t]here is nobody else in the world [other than Intel that Future Link] could really be thinking of when [it says, in its accusations regarding the '570 patent] 'all

21

other Dell products . . . .'" (Tr. at 40-42; *see also* D.I. 15 at 6-7)

If factual assertions like these were in the Complaint regarding the '570 patent, an objective reviewer might understand why even though the Dell Letter does not specifically reference a controversy regarding Dell products containing Intel components, such a letter would have been doing so implicitly. In that scenario, Intel could more persuasively argue that the letter's reference to "[a]ll other Dell products using and/or containing Southbridge devices . . . ." was the equivalent of a reference to "[a]ll other Dell products using and/or containing *Intel* Southbridge devices . . . ." Such facts, presumed true, might well provide the necessary context to give rise to declaratory judgment jurisdiction—by demonstrating, objectively, that Future Link's allegations against Dell were also implicit allegations of direct infringement against Intel.

The difficulty is that none of these assertions *were* contained in the Complaint. Nor are they contained in documents attached thereto or referenced therein. For now, they merely amount to attorney argument, and the Court cannot consider them here.[12] *Cf. Adobe Sys.*, 2011

---

[12] In support of its arguments, Intel also submitted four exhibits that are not referenced anywhere in the Complaint. (D.I. 16, exs. 4-7; *see also* D.I. 1) The Court also concludes that it cannot consider the content of these exhibits when assessing the instant facial challenge to jurisdiction. As to the first of the exhibits—an "NXP/IP Value" claim chart—Intel's argument appears to be as follows: (1) in the Dell Letter, Future Link references an October 3, 2011 notice letter sent by NXP Semiconductors N.V. ("NXP") (then the owner of certain of the patents-in-suit) to Dell, accusing Dell of infringement of the patents; (2) the NXP/IP Value claim chart was enclosed along with the October 3, 2011 letter; and so (3) the Court can consider the content of the NXP/IP Value claim chart (and its references to certain Intel products) in assessing whether the Dell Letter amounts to an accusation of infringement against Intel. (Tr. at 38-39) The Court does not see how it can draw these conclusions from content of the materials that it may properly consider. The Complaint does not allege that the NXP/IP Value claim chart was enclosed along with the October 3, 2011 NXP letter, and the Dell Letter's contents do not suggest this either. (D.I. 1; D.I. 16, ex. 1 at 1) As to the second exhibit—a product brief for the Intel X58 Chipset—that document is referenced nowhere in the Complaint, nor in the exhibits attached thereto. (D.I. 16, ex. 5) And as to the third and fourth of these exhibits—two subpoenas that Intel received in unrelated litigation—both are dated May 28, 2014, and thus post-

22

WL 6101545, at *4 (finding no controversy as to the declaratory judgment plaintiff's liability for direct infringement where, *inter alia*, it stated at the oral argument "that it provided its customers with all of the technology that [the patentee] alleges is infringing," but it did not make those allegations in the complaint). As a result, declaratory judgment jurisdiction does not exist as to claims of direct non-infringement as to these remaining Future Link patents.

### (2) Induced infringement

With regard to the allegations of induced infringement as to the remaining Future Link patents, the Court cannot find subject matter jurisdiction. As previously discussed, there are not sufficient allegations to establish that Future Link was accusing *Intel*'s products of being used for infringement. Likewise, none of those accusations suggest that Intel was encouraging infringement in any way.

Unlike in *Arris* or *DataTern*, here Future Link did not provide any of its letter targets with claim charts—let alone charts demonstrating how Intel provides the necessary components to infringe or how Intel provides instructions on how to infringe. 755 F.3d at 905. Indeed, the accusations here are not even as strong as those found wanting in *DataTern* (i.e., the allegations as to Microsoft regarding DataTern's '402 patent). Those accusations at least asserted that Microsoft's customers *used Microsoft's products* to infringe the patent (though they did not sufficiently explain how Microsoft encouraged that infringement). *Id.*

Intel's arguments for subject matter jurisdiction here rely exclusively for support on the

---

date the filing of the Complaint. (*Id.*, exs. 6-7) Such post-Complaint facts could not create subject matter jurisdiction where none existed at the time of filing. *DataTern*, 755 F.3d at 906. For all of these reasons, the Court will not consider the content of any of these four exhibits in resolving the instant Motion to Dismiss.

holding in *DataTern*. (D.I. 15 at 11-12) But as set out above, the Federal Circuit's guidance in *DataTern* demonstrates why Intel's arguments fail, not why they succeed.

### (3) Contributory infringement

For much the same reasons, Intel has also failed to sufficiently allege a dispute regarding contributory infringement as to the remaining Future Link patents. Again, to meet that bar, Intel must allege facts showing why *its components* were impliedly accused of infringing, and why those products were accused of being especially made or adapted to infringe the claims at issue and of having no substantial non-infringing uses. Ultimately, the allegations do not sufficiently make it clear that Future Link was putting Intel's products at issue as to these eight patents, let alone in a fashion that could encompass contributory infringement.

### d. Indemnification

The second theory cited by Intel in support of subject matter jurisdiction relates to Intel's asserted indemnity obligations to its customers. (D.I. 15 at 12-17) In its Complaint, Intel alleges that it has "received indemnity demands from its customers based on Future Link's patent infringement accusations" and that "Intel is obligated to indemnify its customers for third-party patent infringement claims in accordance with the terms of the respective agreements governing sales to those customers[.]" (D.I. 1 at ¶ 14)[13]

___

[13] Future Link faults Intel for not specifying in the Complaint which "customers" Intel refers to here. (D.I. 9 at 7) Intel responds that it was referring to Dell, HP and Promise, and to its indemnity agreements with those entities. (D.I. 15 at 7, 14) The Court agrees with Intel that this is a reasonable inference to draw. After all, this key paragraph in the Complaint refers to indemnity "demands from [Intel's] customers" that are "based on Future Link's patent infringement allegations[.]" (D.I. 1 at ¶ 14) And the only "Future Link[] patent infringement allegations" that have been previously referenced in the Complaint prior to this paragraph are those made in the Dell, HP and Promise Letters, respectively.

The Federal Circuit has held that "where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if . . . the supplier is obligated to indemnify its customers from infringement liability." *Arris*, 639 F.3d at 1375. In such a case, the supplier would "stand in the shoes of the customers and would be representing the interests of their customers because of their legal obligation to indemnify." *DataTern*, 755 F.3d at 904. The cases cited by Intel in support of its argument here all recognize this basic principle. (D.I. 15 at 13-14)

However, that principle applies when the patent holder's accusations are based on the sale or use "of a supplier's equipment" (since those are the kinds of accusations that are presumably going to trigger indemnity obligations of that supplier). None of Intel's cases suggest that courts have found subject matter jurisdiction to exist when it was *unclear* from the Complaint that a patent holder's allegations against the customer in fact related to the sale or use of the supplier's equipment in the first place. And, as noted above, that is the circumstance here as to eight of the nine Future Link patents—it just is not clear enough from the Complaint (and the Dell, HP and Promise Letters) that Future Link was actually putting Intel components at issue. Thus, the nature of Intel's indemnity obligations to Dell, HP and Promise could not be of any moment as to Intel's declaratory judgment claims regarding all of the patents, except the '0576 patent.

With respect to that '0576 patent, the Court has already found subject matter jurisdiction over all claims except claims 17-19. Therefore, the Court examines only those three remaining claims now. In doing so—and even assuming that Future Link was actually accusing Dell, HP and Promise of directly infringing claims 17-19—the Court concludes that Intel has not

25

sufficiently demonstrated that subject matter jurisdiction exists as to the claims.

In the key paragraph of its Complaint, Intel asserts that it "is obligated to indemnify its customers for *third-party infringement claims in accordance with the terms of the respective agreements* governing sales to those customers." (D.I. 1 at ¶ 14 (emphasis added)) Those allegations are problematic because they only beg obvious next questions. Are the particular "terms" of Intel's indemnification agreements with Dell, HP and Promise of a kind such that Intel is, in fact, "obligated to indemnify" those three entities as to *Future Link's* infringement accusations relating to the use of Intel components? Or, as to the particular terms of these three agreements, is it the case that Intel is not actually obligated to indemnify these three customers?

In the Complaint, Intel is careful not to commit to an answer to these questions.[14] The most Intel clearly asserts is that these three customers have made *requests* for indemnification. Indeed, a close read of Intel's allegations shows that they could be just as compatible with a future effort by Intel to deny any indemnity obligation as they would be with an acknowledgment that one exists.

In the absence of a clear, direct allegation that Intel is obligated to indemnify its customers with regard to Future Link's accusations against them—and with the actual indemnification agreements not being part of the record here—the Court cannot find that Intel has demonstrated the existence of actual controversy regarding claims 17-19 based on an indemnity theory. *See, e.g., DataTern*, 755 F.3d at 904 (noting that it is not a customer's demand

---

[14]     Intel was more forceful on this point in its briefing and at oral argument, asserting there that its agreements with Dell, HP and Promise do, in fact, obligate it to indemnify those entities against "covered claims, like those made by Future Link, that are directed at Intel's products." (D.I. 15 at 14; *see also* Tr. at 60-63) But assertions like that were not clearly made in the Complaint, and for now, are simply attorney argument that cannot be considered.

for indemnification that would provide the key to a supplier's standing in such a case, but instead the "merit of the customer request" and whether such a request was "valid"); *Microchip Tech. Inc. v. Chamberlain Grp., Inc.*, 441 F.3d 936, 944 (Fed. Cir. 2006) (finding no subject matter jurisdiction via an indemnity theory and noting that the declaratory judgment plaintiff had not "produced any agreement indemnifying a customer against infringement of the patents-in-suit"); *Proofpoint, Inc. v. InNova Patent Licensing, LLC*, No. 5:11–CV–02288–LHK, 2011 WL 4915847, at *5 (N.D. Cal. Oct. 17, 2011) (finding no subject matter jurisdiction based merely on a declaratory judgment plaintiff's allegations that it received indemnity requests from its customers, where the plaintiff had not "alleged the existence of a valid agreement nor described its supposed obligations") (citing cases).

### B.  Motion to Dismiss for Failure to State a Claim

Future Link also asserts that Intel has failed to state a claim for non-infringement, based on Intel's asserted failure to "specify[] the particular products for which [it] seeks such a declaration." (D.I. 9 at 9-11) The only remaining non-infringement claim (not already recommended for dismissal above due to lack of subject matter jurisdiction) is that in Count 15, which relates to the '0576 patent; as to that patent, only a direct non-infringement claim as to claims 1-16 and 20-21 remains before the Court. (D.I. 1 at ¶¶ 116-120) Future Link's charge here is that Intel's claim, which simply asserts that Intel and its customers do not infringe the patent directly or indirectly "based on [the] alleged use of technologies provided by Intel components[,]" (D.I. 1 at ¶ 118), is too "vague[.]" (D.I. 9 at 9) Future Link suggests that with this language, Intel seeks a declaration on "every single product that Intel offers and the products of every single customer that Intel supplies." (*Id.*)

With regard to declaratory judgment claims of direct non-infringement, Intel is required

to make allegations that equal or exceed the level of specificity required by Form 18 of the

Federal Rules of Civil Procedure. *TSMC Tech., Inc. v. Zond, LLC*, Civil Action No. 14-721-

LPS-CJB, 2014 WL 7498398, at *5 (D. Del. Jan. 8, 2014); *McRo, Inc. v. Rockstar Games, Inc.*,

Civil Action Nos. 12-1513-LPS-CJB, 12-1517-LPS-CJB, 12-1519-LPS-CJB, 2014 WL 1051527,

at *2 (D. Del. Mar. 17, 2014) (citing *K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*, 714

F.3d 1277, 1283-84 (Fed. Cir. 2013)), *report and recommendation adopted*, 2014 WL 1677366

(D. Del. Apr. 24, 2014). In terms of providing sufficient notice as to the nature of the accused

products at issue, Form 18 requires little: only an identification of a general category of accused

products. *TSMC Tech., Inc.*, 2014 WL 7498398, at *6; *Clouding IP, LLC v. Amazon.com, Inc.*,

C.A. Nos. 12–641–LPS, 12–642–LPS, 12–675–LPS, 2013 WL 2293452 at *2 (D. Del. May 24,

2013); *Xpoint Techs., Inc., v. Microsoft Corp.*, 730 F. Supp. 2d 349, 353 (D. Del. 2010) ("[I]t is

not necessary to identify specific products, i.e. model names, but plaintiffs['] pleadings must

mimic Form 18 and identify a general category of products."); *see also* (Tr. at 30).

Although Intel's allegations in Count 15 are sparse as to the products at issue, the

remainder of its Complaint provides needed context. As an initial matter, Count 15's reference

to Intel's "customers" can be only a reference to the products of the three "customers" previously

referenced in the Complaint: Dell, HP and Promise. (D.I. 1 at ¶¶ 9-12) The Complaint (and the

Dell, HP and Promise Letters referenced therein) also make clear that, as to the allegations

regarding the '0576 patent, the Intel components at issue are Intel chips "using and/or supporting

[Intel] QuickPath Interconnect" technology. (*Id.* at ¶ 9 (alteration in original) (internal quotation

marks omitted); *see also id.* at ¶¶ 9-11; D.I. 16, ex. 1 at 4; *id.*, ex. 2 at 3; *id.*, ex. 3) This group of

Intel components are said to include, more specifically, at least Intel Xeon 5500, 5600, E5 or E7 series processors (i.e., the specific Intel components referenced in the Dell Letter). (D.I. 16, ex. 1 at 4)

Thus, when Count 15 refers to Dell, HP and Promise's "alleged use of technologies provided by Intel components[,]" (D.I. 1 at ¶ 118), the above general categories of products (and a few specific products) are what Intel is referring to. Future Link does not make a compelling argument as to why—as to these allegations regarding the '0576 patent—Rule 12(b)(6) is not satisfied. *See Cold Spring Granite Co. v. Matthews Int'l Corp.*, Civil No. 10-4272 (JRT/LIB), 2011 WL 4549407, at *2 (D. Minn. Sept. 29, 2011) (denying a Rule 12(b)(6) motion to dismiss declaratory judgment counts of non-infringement, in light of the court's finding that the counts did sufficiently specify the products or methods asserted to infringe the patent-in-suit, where the products at issue were "cast bronze products resulting from the process of conversion from photographic images"). Thus, the Court recommends denial of the Motion to Dismiss on this ground.

## III. CONCLUSION

For the reasons explained above, the Court recommends that Future Link's Motion to Dismiss be GRANTED with respect to Counts 1-14 and 17-20.[15] The Court recommends that

---

[15]    Count 19 relates to Intel's request for a declaratory judgment that it is licensed to five of the patents-in-suit (the '357, '570, '823, '738, and '108 patents), and Count 20 relates to Intel's request for a declaratory judgment that Future Link's infringement assertions and license demands as to those patents are barred at least in part by the doctrine of patent exhaustion. Because the Court has recommended dismissal of the substantive non-infringement and invalidity claims as to these patents due to a lack of subject matter jurisdiction, and because Counts 19 and 20 are premised on an existing case or controversy regarding those five patents, (*see* D.I. 1 at ¶¶ 143-44, 148-49), the Court therefore recommends dismissal as to these two related counts as well, since they only raise alternative defenses to infringement. *See Keurig, Inc.*

29

the Motion to Dismiss be DENIED with respect to Count 16, and GRANTED-IN-PART with respect to Count 15. Specifically, with respect to Count 15, the Court recommends that the Motion to Dismiss be GRANTED with respect to indirect infringement of all claims of the '0576 patent and direct infringement of claims 17-19, and DENIED with respect to direct infringement of claims 1-16 and 20-21.

As to the claims recommended for dismissal (and particularly because the challenge to subject matter jurisdiction here was a facial one), the Court recommends that dismissal be without prejudice. It is within this Court's discretion to grant leave to amend, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), and because amendment should be allowed "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), and because it is not clear that amendment would cause undue prejudice or would be futile, the Court recommends that Plaintiff be given leave to file a further amended complaint addressing the deficiencies outlined above. *See, e.g., AngioDynamics, Inc. v. Diomed Holdings, Inc.*, C.A. No. 06–02 GMS, 2006 WL 2583107, at *5 & n.3 (D. Del. Sept. 7, 2006); *accord Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 980 (Fed. Cir. 2005) (explaining that "dismissal with prejudice is generally inappropriate where [a] standing defect can be cured").[16] Indeed, based on the assertions of its counsel at oral argument, it appears possible that Intel can, in fact, set out subject matter jurisdiction as to at least some of

---

*v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013) ("Patent exhaustion is an affirmative defense to a claim of patent infringement[.]"); *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995) (explaining that the existence of a license is a defense to patent infringement).

[16]     To the extent that Future Link argues that the Court should exercise its inherent authority to decline to hear the declaratory judgment claims, (D.I. 9 at 13), the Court declines to recommend that the District Court take this path.

the claims recommended for dismissal. *See Adobe Sys.*, 2011 WL 6101545, at *5-6.[17]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: February 12, 2015

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[17]     Future Link was unable to cite a case involving similar circumstances where dismissal with prejudice was granted. (Tr. at 33)