# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTEL CORPORATION,

    Plaintiff,

v.

FUTURE LINK SYSTEMS, LLC,

    Defendant.

UNSEALED ON
AUGUST 3, 2017

C.A. No. 14-377-LPS

---

Jack B. Blumenfeld, Maryellen Noreika, Jeremy A. Tigan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Adam Alper, Sarah E. Piepmeier, Akshay S. Deoras, KIRKLAND & ELLIS LLP, San Francisco, CA

Michael W. De Vries, Christopher M. Lawless, Kevin D. Bendix, Benjamin A. Herbert, KIRKLAND & ELLIS LLP, Los Angeles, CA

Gregory S. Arovas, Jon R. Carter, KIRKLAND & ELLIS LLP, New York, NY

Lien K. Dang, Eric B. Cheng, KIRKLAND & ELLIS LLP, Palo Alto, CA

David Rokach, KIRKLAND & ELLIS LLP, Chicago, IL

    Attorneys for Plaintiff Intel Corporation.


Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE

Morgan Chu, Benjamin W. Hattenbach, Ellisen S. Turner, Richard W. Krebs, Amy E. Proctor, Dominik Slusarczyk, Molly Russell, IRELL & MANELLA LLP, Los Angeles, CA

    Attorneys for Defendant Future Link Systems, LLC.

---

## MEMORANDUM OPINION

July 31, 2017
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court are four summary judgment and *Daubert* motions: (1) Future

Link Systems, Inc.'s ("Defendant," "FLS," or "Future Link") motion for summary judgment (D.I.

520); (2) Intel Corporation's ("Plaintiff" or "Intel") motion for summary judgment that U.S.

Patent No. 7,478,302 is indefinite and that Intel does not infringe U.S. Patent Nos. 5,754,867;

6,052,754; 6,317,804; and 5,870,570 (D.I. 522); (3) Future Link's motion to preclude expert

testimony[1] (D.I. 526); and (4) Intel's motion for summary judgment of no willfulness and no

unclean hands (D.I. 531).

For the reasons discussed below, the court will grant in part and deny in part Future

Link's motion for summary judgment (D.I. 520); deny Intel's motion for summary judgment on

indefiniteness and non-infringement (D.I. 522); grant in part and deny in part Future Link's

motion to preclude expert testimony (D.I. 526); and grant in part and deny in part Intel's motion

for summary judgment of no willfulness and no unclean hands (D.I. 531).

## I.    LEGAL STANDARDS

### A.    Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." The moving party bears the burden of

demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or,

---

[1] A prior Memorandum Opinion (D.I. 618) addressed the portions of Future Link's motion to
preclude expert testimony related to Intel experts Drs. Gregory Leonard and Douglas Clark. This
Memorandum Opinion will address the remaining portions of Future Link's motion.

1

alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating

2

entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

## B. Expert Testimony

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Rule 702(a) requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d).

There are three distinct requirements for proper expert testimony: (1) the expert must be qualified; (2) the opinion must be reliable; and (3) the expert's opinion must relate to the facts. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

## II. Future Link's Motion for Summary Judgment (D.I. 520)

Future Link seeks summary judgment on seven grounds, arguing that Intel failed to: (1) show that any FLS patents are standards-essential; (2) show that equitable estoppel applies; (3) support its numerous prior art theories by admissible evidence; (4) show that it is licensed to

3

any asserted patent; (5) show that any asserted patent is unenforceable; (6) show that the marking statute applies; and (7) join necessary third parties, Dell and HP.[2]  (D.I. 520)

## A.  Standards-Essential Licensing

Intel asserts that standards-essential reasonable and non-discriminatory ("RAND") licensing requirements attach to U.S. Patent Nos. 5,608,357; 7,917,680; 7,983,888; and 5,870,570. In its motion for summary judgment, Future Link argues that Intel failed to meet its burden of demonstrating that RAND licensing requirements attach to these patents, as Intel failed to show that (1) each patent contains at least one "Necessary Claim" and (2) there were no commercially reasonable non-infringing alternatives. (D.I. 521 at 3-4) In particular, Future Link contends that Intel's expert, Dr. Ray Perryman, wrongly classifies claims as "Necessary Claims" when "*any element* of the claim – not the claim as a whole – is necessarily embodied by products that implement a PCI-SIG [(PCI Special Interest Group)] standard." (*Id.* at 4; *see also* D.I. 537.093 at ¶ 78 ("If an implementation practices any part of a patent, even just a partial claim, a RAND commitment is necessary.")) Future Link adds that Intel's other experts erroneously base their analyses on Dr. Perryman's misinterpretation, but none of the experts, including Dr. Perryman, showed that the infringement could not have been avoided by another commercially reasonable non-infringing implementation. (D.I. 521 at 6-7)

---

[2] Future Link also initially sought summary judgment on two other issues, arguing that: (1) Intel's declaratory judgment claims for non-infringement and invalidity of U.S. Patent Nos. 6,636,166 and 6,920,576 should be dismissed because FLS covenanted not to sue on those patents; and (2) Intel failed to carry its burden to prove that a significant number of its prior art references anticipate or render obvious claims of the patents-in-suit. (D.I. 521 at 8, 15) In response, Intel has dismissed its claims regarding the '166 and '0576 patents and stated that it would not "assert the prior art references identified in . . . FLS's motion for the specific anticipation or obviousness grounds that FLS identifies . . . for each corresponding patent claim at issue in th[e] matter." (D.I. 555 at 10, 12) Therefore, both of these issues are now moot.

Intel responds that Dr. Perryman properly opined that "it is not a requirement for every single element of a patent claim to be infringed by *every single implementation* of a standard in order for that claim to be subject to the standard's RAND obligation." (D.I. 555 at 6) According to Dr. Perryman, "a claim may be a 'Necessary Claim' so long as that claim is necessarily infringed by 'an implementation of a Specification' and one or more elements of the claim are within the 'Scope' as described by the Bylaws." (D.I. 556, Ex. 4 at ¶ 77) Additional claim elements that "merely add basic, well-known items or that otherwise describe compliant implementations of a Specification" need not be met by each implementation in order for a claim to be a "Necessary Claim." (*Id.* at ¶ 82) Because Dr. Perryman's opinion is supported by substantial evidence, Intel asserts that summary judgment would be improper. (D.I. 555 at 6) Intel also argues that experts are permitted to rely on the expertise of other qualified experts, and that each of those who relied on Dr. Perryman's interpretation also provided detailed technical analyses concerning why the asserted claims are RAND obligated. (*Id.* at 9) Lastly, Intel adds that its experts investigated non-infringing alternatives and concluded that no such commercially reasonably non-infringing implementation existed at the relevant time period. (*Id.*)

The PCI-SIG Bylaws define a "Necessary Claim" as a claim that is "necessarily infringed by an implementation of a Specification . . . and which [is] within the bounds of the Scope, where such infringement could not have been avoided by another commercially reasonable noninfringing implementation of such Specification." (D.I. 556, Ex.3 at PCI-SIG000309) The Bylaws define "Scope" as "the protocols, electrical signaling characteristics, mechanical requirements for connectors, cards and cabling, register models, data structures and verbs software interface *solely to the extent disclosed* with particularity in a Specification . . . [but that]

5

the *Scope shall not include . . . any enabling technologies* that may be necessary to make or use any product or portion thereof that complies with a Specification, but are not themselves expressly set forth in a Specification . . . ." (*Id.* at PCI-SIG000310) (emphasis added)

The Court agrees with Future Link that Intel's interpretation of "Necessary Claim" – as including claims even when only some elements are infringed (even when non-infringed elements are merely enabling technologies) – improperly expands the Scope of a "Necessary Claim" beyond the definition provided for by the Bylaws. The Bylaws explicitly exclude from the definition of "Scope" – and therefore from the definition of "Necessary Claim" – any "enabling technologies," whether claimed alone or in combination with explicit steps of the standard.[3]

While the Court agrees with Intel that technical experts are permitted to rely on the reasonable analyses of another expert, Dr. Perryman's analysis on these points was not reasonable, given its reliance on an incorrect interpretation of "Necessary Claim." Lastly, the Court agrees with Future Link that Intel's technical experts failed to consider whether non-infringing implementations existed. Intel's only cited support is the entirety of each experts' report on the issue of "Necessary Claims," and the only portions of those reports that discuss non-infringing alternatives are conclusory. (*See* D.I. 592, Ex. 8 at ¶¶ 3154, 3158, Ex. 7 at 1437, Ex. 6 at ¶¶ 1062-86)

---

[3] This case is different from *In re Innovatio IP Ventures, LLC Pat. Litig.*, 956 F. Supp.2d 925, 937 (N.D. Ill. 2013), in which the Northern District of Illinois came to the opposite conclusion, because the bylaws there excluded from the definition of an "Essential Patent Claim" – the equivalent of a "Necessary Claim" here – claims that were "essential *only* for Enabling Technology." The bylaws in that case, therefore, left open the classification of claims directed to *both* enabling technology and explicit steps of the standard.

6

The Court will, therefore, grant Future Link's motion for summary judgment that RAND licensing requirements do not attach to the asserted claims of the '357, '680, '888, and '570 patents.

## B. Equitable Estoppel[4]

In order to establish equitable estoppel, an alleged infringer must show by a preponderance of the evidence that: (1) the patentee, through misleading words, conduct, or silence, led the alleged infringer to reasonably infer that the patentee did not intend to enforce its patent rights; (2) the alleged infringer relied on the patentee's conduct; and (3) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1041, 1046 (Fed. Cir. 1992) (en banc).

Future Link argues that Intel cannot meet its burden because Intel and Future Link had no contact prior to Intel filing suit. (D.I. 521 at 14) Even if Intel relied on Future Link's silence, in FLS's view, estoppel cannot apply because Future Link never threatened Intel with enforcement prior to Intel filing suit, and plainly cannot have delayed unreasonably in bringing suit after threatening to do so. In addition, Future Link contends that Intel's communications with prior owners of the patents, which Intel relies on to make Future Link's silence relevant, did not include the asserted patents and, in fact, took place years before any of the Future Link patents existed. (D.I. 590 at 4) Finally, Future Link asserts that Intel's claim that it was unaware of the

---

[4] In addition to seeking summary judgment on Intel's equitable estoppel defense, Future Link also moved for summary judgment on Intel's laches defense. In light of the Supreme Court's decision in *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*, 137 S. Ct. 954 (2017), Intel has withdrawn its laches defense. (D.I. 555 at 10 n.6)

asserted patents – and that it first learned of them within a year of filing its declaratory judgment action – precludes it from arguing that it relied on any alleged silence by Future Link or the previous patent owners. (*Id.*)

Intel responds that its estoppel defense is not limited to *Future Link's* interactions with Intel, but is instead based on the conduct of the prior owners of the patents, Philips Electronics N.V. and the North American Philips Corporation (collectively, "Philips") as well as NXP Semiconductors ("NXP"). (D.I. 555 at 10) Intel asserts that: (1) in 1990, Intel entered into a cross license with Philips, that is valid and not terminated; and (2) in 2007, Intel entered into license negotiations with NXP, but no license was ever consummated. (*Id.* at 11) Despite these interactions, neither Philips nor NXP ever accused Intel of infringement, even though Intel was a competitor in the semiconductor industry. (*Id.* at 11-12) Thus, Intel asserts that factual issues surrounding these interactions preclude summary judgment on its equitable estoppel defense.

The Court agrees with Future Link. Factual disputes surrounding Intel's communications with Philips and NXP are not material given Intel's admission that it was not aware of the Future Link patents until (1) Intel's customers told it about Future Link's assertion letters (for the patents asserted in Intel's declaratory judgment action), or (2) Future Link filed its counterclaims on July 10, 2015 (for the patents asserted in the counterclaims). These admissions mean the only reasonable conclusion on this record is that Intel could not have been misled about Future Link's – or the prior patent owners' – intentions with respect to enforcement of these patents. (*See* D.I. 590 at 4-5; *see also Philips Elec. N. Am. Corp. v. Contec Corp.*, 312 F. Supp. 2d 639, 642 (D. Del. 2004)

Accordingly, the Court will grant Future Link's motion for summary judgment.

8

## C. Prior Art

Future Link asserts that many of Intel's prior art theories are not supported by admissible evidence, but are instead based only on unreliable expert testimony. (D.I. 521 at 19) Intel argues, and the Court agrees, that this argument is essentially a cross-reference to Future Link's concurrently-filed *Daubert* motion. (D.I. 555 at 13) As discussed below, the Court will deny Future Link's motion to exclude Dr. Levy's expert testimony. Therefore, the Court will also deny this portion of FLS's summary judgment motion.

## D. Licensing

As a defense to Future Link's claims of infringement, Intel asserted: (1) a claim for a declaration that it is licensed to the '357, '570, '823, '738, and '108 patents; (2) a claim for a declaration of patent exhaustion based on that license; and (3) affirmative defenses based on the same license and patent exhaustion contentions. (D.I. 521 at 23; D.I. 363 at 26) On summary judgment, Future Link seeks judgment with respect to each of these contentions based on: (1) Intel's experts' failure to appropriately analyze and support the commercialization requirement of the Philips-Intel license, "[d]espite the Court's explicit guidance" that Intel must do so (D.I. 521 at 19-21; D.I. 442); (2) the fact that Intel's license assertions are inconsistent with its non-infringement positions as, on the one hand, Intel asserts that none of its products infringe any claims of any patents-in-suit, but on the other hand claims that all of its products practice or embody claims of the patents-in-suit as part of its license claims and defenses[5] (D.I. 521 at 23);

_____

[5] While the Court previously denied this argument in Intel's earlier summary judgment motion, noting that infringement and non-infringement contentions could still change, Future Link asserts that it is now appropriate to resolve this issue because fact and expert discovery have closed and the parties have exchanged their final infringement and non-infringement contentions. (D.I. 521 at 23)

9

(3) Intel's experts' failure to show that any Philips products met other commercialization requirements, such as being "Digital MOS Integrated Circuits" or "offered for sale . . . freely . . . to any and all interested third parties" (*Id.* at 24-25); and (4) Intel's experts failure to analyze commercialization under their own interpretations of the claims, instead basing their analyses on Future Link's interpretation (*Id.* at 25).

Intel responds that summary judgment on these grounds is improper because its experts have provided detailed evidence through hundreds of pages of claim charts, circuit diagrams, and supporting evidence, from which a factfinder could reasonably find both (1) satisfaction of the commercialization requirement and (2) that the Philips commercialized products are Digital MOS Integrated Circuits that were freely offered for sale. (D.I. 555 at 13-15, 18-19) Further, Intel contends that it is permitted to press alternative arguments – like Intel's denial of infringement, but alternative contention that if Future Link's assertions of infringement are correct then Intel's products are licensed. (*Id.* at 20)

The Court agrees with Intel. Consistent with the Court's guidance, Intel supplemented its expert reports with claim charts comparing the licensed patents to the commercialized Philips products. Future Link's challenges to these claim charts – namely that they are insufficient, repetitive, and not meaningful – go to the factual underpinnings of Intel's experts' reports and, hence, present fact disputes. Similarly, Intel has adduced sufficient evidence (including expert reports) from which a reasonable jury could (but need not) find that the Philips products are Digital MOS Integrated Circuits that were freely offered for sale. Finally, Future Link's concerns that Intel's infringement position is inconsistent with its licensing defense, and further, that Intel's experts only analyzed commercialization under Future Link's interpretation of the claims,

10

do not entitle it to summary judgment. As the Court previously noted (*see* D.I. 442 at 33), such alterative arguments, and arguments analyzed under an opposing party's interpretation of the claims, are permissible.

The Court will, therefore, deny Future Link's motion for summary judgment.

### E    Unenforceability

Future Link seeks summary judgment on Intel's Third and Seventh Affirmative Defenses to the extent they depend on the unenforceability of the Future Link patents.[6] (D.I. 521 at 26) Future Link largely equates unenforceability with inequitable conduct and asserts that its motion should be granted because Intel has not offered any evidence of inequitable conduct. (*Id.*) Intel responds that it did not assert any inequitable conduct defense and, thus, the motion should be denied as moot. (D.I. 555 at 20-21) In its reply, Future Link emphasizes that it seeks summary judgment of no unenforceability on any basis – not just inequitable conduct – and points out that in opposition to the motion, Intel failed to articulate any theory of unenforceability or support any such theory with evidence. (D.I. 590 at 11)

It is true that Intel did not assert an inequitable conduct defense. It is also true that Future Link's motion is not limited to inequitable conduct, and that Intel has failed to present evidence to support any defense of unenforceability. In its briefing, Intel cites only to (a) its own interrogatory responses, which fail to address unenforceability but, instead, discuss prosecution history estoppel and licensing, (b) six pages of a rebuttal expert report that, again, only discusses

---

[6] Intel's Third Affirmative Defense alleges that "Intel has not infringed and does not infringe any valid and enforceable claim of the Counterclaim Patents." (D.I. 363 at 25) Intel's Seventh Affirmative Defense alleges that "[s]ome or all of Future Link's claims are barred by one or more of the doctrines of waiver, acquiescence, laches, estoppel . . . , and unenforceability." (*Id.* at 26)

11

issues related to licensing, and (c) one page of an opening expert report discussing PCI-SIG bylaws and licensing. Intel does nothing to explain how a reasonable factfinder could find FLS's patents to be unenforceable based on these materials.

Therefore, the Court will grant Future Link's motion to the extent the Third and Seventh Affirmative defenses depend on the unenforceability of FLS patents.

## F. Marking

Future Link argues that Intel cannot meet its burden under 35 U.S.C. § 287 for three reasons: (1) regarding the '439, '823, and '867 Patents, Future Link contends that it has asserted only method claims, so § 287 does not apply; (2) regarding the '754, '6576, '302, '257, '680, '888, and '614 Patents, Intel has failed to identify the existence of any patent-practice articles, nor has it offered any evidence that any products actually practice these patents; and (3) regarding the '108, '357, '570, and '804 Patents, Intel has "claimed, but failed to establish that Future Link's predecessors-in-interest marketed products practicing the . . . [p]atents." (D.I. 521 at 26-28) Intel responds that the burden under the marking statute lies with Future Link, as the patent owner, to show that no patented products were sold or that, if they were, that Future Link complied with § 287. (D.I. 555 at 21-22)

The Court agrees with Future Link that the burden lies first with the alleged infringer to identify products the patentee sold that practice the alleged patents. *See MobileMedia Ideas, LLC v. Apple Inc.*, 209 F. Supp. 3d 756, 763 (D. Del. 2016). However, a genuine dispute of material fact exists with respect to this issue. That is, a reasonable jury could find that Intel has identified products sold by FLS or its predecessor owners of the patents-in-suit listed in (2) and (3) in the preceding paragraph. Hence, the Court will deny Future Link's motion for summary

12

judgment with respect to marking and the 11 patents listed in the preceding subsections of the preceding paragraph. The Court agrees with FLS that the marking requirement does not apply to the asserted method claims of the '439, '823, and '867 patents, and will grant FLS's motion with respect to these patents.

### G.    Joinder

Future Link seeks to dismiss Intel's claims for declaratory judgment because Intel did not join necessary and indispensable parties: Intel customers, HP and Dell, who are the accused direct infringers. (D.I. 521 at 29) Future Link argues that adjudication must be limited to Intel's liability for indirect infringement and not extend to HP's and Dell's liability for direct infringement. *(Id.)*

Intel responds that this is "at least the second time that FLS has raised essentially the same issue," and cites the Court's previous order denying Future Link's motion to dismiss the declaratory judgment claims for non-infringement on behalf of HP and Dell, where the Court found that subject-matter jurisdiction existed "over Intel's requests for customer non-infringement declarations with respect to Dell and HP products." (D.I. 555 at 24) (citing D.I. 274 at 34) The Court held that Intel is obligated to indemnify HP and Dell for their use of Intel products and Intel stands in the shoes of HP and Dell and represents their interests in the action. *(Id.)* (citing D.I. 274 at 24-25)

In its reply, Future Link asserts that the Court's determination of ***subject matter jurisdiction*** does not address whether HP and Dell are ***necessary and indispensable parties*** for a final judgment regarding their direct liability for patent infringement concerning their own

13

products.[7] (D.I. 590 at 14) Future Link argues that "[m]erely standing in the shoes of another party . . . fails to prevent that party from being necessary and indispensable." (*Id.* at 15) (internal quotation marks omitted)

The Court will deny FLS's motion. Even assuming that the Court's finding of subject matter jurisdiction does not completely foreclose Future Link's argument, to obtain the relief FLS seeks would require it to show at least, with respect to HP and Dell, that "(1) in that person's absence, the court cannot accord complete relief among existing parties; or (2) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a). There is no basis to conclude that the Court cannot accord complete relief between FLS and Intel without HP and Dell; nor do either HP or Dell claim any interest relating to the subject of this action. Simply put, HP and Dell are not necessary parties.

## III.   Intel's Motion for Summary Judgment Relating to Indefiniteness and Non-Infringement (D.I. 522)

### A.   Indefiniteness

Intel seeks summary judgment that FLS's '302 patent is invalid due to indefiniteness. The '302 patent discloses "a method suitable for testing an integrated circuit device," wherein the device comprises "at least one module" that "incorporates at least one associated module monitor

---

[7] Intel's declaratory judgment action seeks a determination that Dell and HP do not directly infringe the Future Link patents through either use of Intel products or use or inclusion of Intel products in Dell/HP end-devices.

suitable for monitoring a device parameter such as temperature, supply noise, cross-talk etc. within the module." '302 Patent, Abstract. The Court construed "'functional block' / 'module(s)'" as "a combination of components that perform a given function." (D.I. 378 at 21)

Intel argues that the asserted claims of the '302 patent are indefinite, reasoning that since a "functional block" can be any combination of components that perform a given function, a person of ordinary skill in the art has no way of determining whether a particular "functional block" includes a decoder or monitor, as required by the claims, and thus infringes. (D.I. 523 at 9) As applied to Intel's products, Intel contends that for the Sandy Bridge processor, the alleged decoder is located inside the PMA unit, separate from the core containing the alleged monitors. (*Id.* at 10) Thus, Intel asserts, if the "functional block" is considered as the entire "slice" containing both the core and the PMA unit, it might infringe; however, if the "functional block" is considered only as the "core," the decoder is separate from it, and the product does not infringe. (*Id.* at 10-11) Because infringement depends on how the "functional block" is defined, and because no such guidance exists to define that functional block, Intel concludes that the claims are invalid as indefinite. (*Id.* at 12)

Future Link responds that courts "'have never required that a claim read on the entirety of an accused device in order to infringe. If a claim reads merely on a part of an accused device, that is enough for infringement.'" (D.I. 553 at 2) (emphasis omitted; quoting *SunTiger, Inc. v. Sci. Research Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999)) Furthermore, the asserted claims use open transitional phrases and, therefore, to Future Link, "infringement cannot be avoided by adding non-infringing structures to an accused device." (*Id.* at 2-3) Future Link argues that the claims inform a person of ordinary skill in the art as to the scope of the invention

15

with reasonable certainty. (*Id.* at 5) Alternatively, at a minimum, Future Link insists that the competing experts' views on what one skilled in the art would have understood about the scope of the invention means that a genuine dispute of material fact exists, making summary judgment inappropriate. (*Id.*)

The Court agrees with Future Link. A reasonable factfinder could find, particularly by crediting Future Link's expert's opinion, that the asserted claims inform a person of ordinary skill in the art as to the scope of the claims with reasonable certainty. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). That Intel can point to the presence of "functional blocks" without decoders and/or monitors in its products does not negate the presence of "functional blocks" *with* decoders and/or monitors in its products. A reasonable factfinder, taking the record evidence in the light most favorable to FLS, would not be compelled to find clear and convincing evidence of indefiniteness.

The Court will deny Intel's motion for summary judgment.

## B.    Non-infringement

### 1.    U.S. Patent No. 5,754,867 ("the '867 patent")

The asserted claims of the '867 patent are means-plus-function claims that the Court construed as having a function of "selecting an external to internal clock frequency ratio," with a corresponding structure of "a signal sent to a RESET pin, a RESET pin, a signal sent to a BUS FREQUENCY pin, and a BUS FREQUENCY pin." (D.I. 378 at 8) The parties dispute whether the required RESET signal must necessarily correspond to the RESET signal of the only embodiment of the claims, the INTEL PENTIUM 815/100.

In seeking summary judgment of non-infringement, Intel argues that the RESET signal

16

required by the Court must be the same as the RESET signal found in the disclosed embodiment. (D.I. 523 at 15) Therefore, the RESET signal must perform an actual reset of the CPU – i.e., it must invalidate the CPU's internal caches or otherwise initialize the CPU. (*Id.* at 15-16) To Intel, any assertion that the RESET signal has a broader meaning than as used in the disclosed embodiment would be contrary to established legal principles. (*Id.* at 18) Because the accused products do not include the type of RESET signal disclosed in the sole CPU embodiment, in Intel's view it follows that they cannot infringe the claims of the '867 patent. (*Id.* at 16)

Future Link responds that the Court's construction did not limit the RESET pin to the specific RESET pin of the disclosed CPU embodiment. (D.I. 553 at 8) Instead, the Court's construction merely requires "a signal sent to *a* RESET pin" and says nothing about *the* RESET signal of the disclosed CPU embodiment. (*Id.* at 9) Future Link points out that both Intel and its expert clearly cite the disclosed CPU embodiment as only an example, not the sole possible embodiment, of the particular type of CPU with the ability to perform the means claimed function. (*Id.* at 10)

The Court agrees with Future Link. The Court's construction is not as limited as Intel asserts, as the construction references "a signal sent to *a* RESET pin,"[8] without referring to the particular CPU embodiment disclosed in the patent. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has

---

[8]To be precise, this is the construction the Court gave to the structure associated with what the parties agreed was a means-plus-function claim term, "means for selecting an external to internal clock frequency ratio." (D.I. 378 at 8-9) While Intel is correct that the term is, thus, limited to the construed structure (*see* D.I. 593 at 5-6), Intel is incorrect in asserting that the Court construed that structure as limited to just the RESET pin and signal in the 815/100 CPU.

17

demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."). The patent specification and prosecution history, as well as both parties' experts (*see* D.I. 553 at 10), support this finding that "RESET" is not so limited. Therefore, there is a genuine dispute of material fact as to whether Intel's accused products contain each element of the asserted claims, and the Court will deny Intel's motion for summary judgment.

### 2. U.S. Patent No. 6,052,754 ("the '754 patent")

The '754 patent is directed to a "centrally controlled interface scheme for promoting design reusable circuit blocks." '754 Patent, Abstract. The patented system "enables existing circuit blocks of a computer system to be connected in a wide variety of shared bus standards while their internal circuitry remains unchanged." *Id.* Future Link alleges that Intel's products implementing the IOSF standard – an interface and interconnection technology that standardizes the interface between circuit blocks and an interconnect "fabric" – infringe the asserted claims of this patent. (D.I. 523 at 5-6)

Intel asserts that its products do not infringe the asserted claims because those claims require "external bus control circuits" to be "connected to a *wide variety* of shared bus standards," whereas the accused "external bus control circuits" in the Intel IOSF fabric "allow the IP agents to connect only to a *single* standard – IOSF." (*Id.* at 20-21) Intel argues that FLS recognizes that the Intel product does not meet this standard, so FLS's experts "raise a new infringement theory not found in FLS's infringement contentions:" that "the alleged 'external bus controls circuits' of the IOSF fabric allow IOSF-compliant IP agents to connect to a single

18

standard (IOSF) that may be arranged in different *topologies.*"[9] (*Id.* at 21) However, because "topology" and "standard" are not the same thing, and the ability to use multiple bus "topologies" does not imply the ability to use multiple bus "standards," Intel argues that its products do not infringe. (*Id.* at 22)

Future Link counters that Intel's position wrongly relies on a rejected claim construction – that it is the "external bus control circuit" that enables circuit blocks to be connected to a wide variety of bus standards. (D.I. 553 at 15) However, Future Link points out, the Court stated that "it is the 'apparatus' *as a whole* that must implement the key advantage [of providing a system which enables circuit components of a computer system to be connected in a wide variety of shared bus schemes while remaining substantially unchanged] rather than the external bus control circuits by themselves." (*Id.*) (quoting D.I. 378 at 13) Therefore the Court construed "external bus control circuit" as "circuitry external to circuit blocks, wherein the circuitry is *part of an apparatus* . . . that allows a plurality of circuit blocks to be connected to a wide variety of shared bus standards while the circuit blocks' internal circuitry remains unchanged." (*Id.*) (quoting D.I. 379 at 2)

Future Link asserts that, applying the Court's claim construction, Intel's products infringe the asserted claims because Intel's IOSF technology "allows IOSF-compliant circuit blocks to be connected to a wide variety of shared bus standards." (D.I. 553 at 16) Future Link cites the

[9] Intel asserts in a footnote that FLS's failure to address the Court's construction and its attempt to raise this new infringement theory not present in its infringement contentions is improper and "should be struck." (D.I. 523 at 22 n.2) Future Link responds that such a request to strike in a summary judgment brief does not comply with the Court's procedures and, furthermore, that Intel's characterization is unsupported and incorrect. (D.I. 553 at 18 n.15) The Court agrees and Intel's request to strike is denied.

19

analysis and findings of its expert, Dr. Mangione-Smith, in asserting that "an important feature of the IOSF primary fabric is that it does not depend on a specific fabric topology, and . . . the ability to support multiple bus topologies is necessary and sufficient to supporting a wide variety of shared bus standards." (*Id.*)

The Court agrees with Future Link. The Court's construction requires that the *apparatus as a whole*, not the external bus control circuits by themselves, must provide a system that enables circuit components to be connected in a wide variety of shared bus standards. Intel's contention that the external bus control circuits in its IOSF fabric can only connect to a single standard does not preclude a finding of infringement. On the material issue – whether the Intel products *as a whole* provide such a system – there is a genuine dispute of material fact, so summary judgment must be denied.

### 3. U.S. Patent No. 6,317,804 ("the '804 patent")

The '804 patent discloses "[a] circuit arrangement and method interface multiple functional blocks within an integrated circuit device via a concurrent serial interconnect capable of routing separate serial command, data and clock signals between functional blocks in the device."

Intel asserts that its products cannot infringe the asserted claims because its IOSF sideband interface does not have *separate* data and command interconnects, but instead has only data lines that carry *both* commands and data. (D.I. 523 at 23) Specifically, Intel argues that the "opcodes" carried on the IOSF "are 'commands' within the context of the '804 Patent." (*Id.*) Intel points to testimony by multiple Intel engineers who all confirm that "data and commands travel over the *same* payload wires" on the IOSF, and concludes that "[b]ecause the *same*

20

payload lines of the accused IOSF sideband interface carry both commands (e.g., opcodes) and data, Intel's products cannot infringe [the] asserted claims . . . , which require that the command and data interconnects/lines be '*separate*.'" (*Id.* at 23-24)

Future Link responds that opcodes are not commands and, even if they were, Intel's IOSF would still meet all of the limitations of the claims of the '804 patent. (D.I. 553 at 22-24) In contesting whether opcodes are equivalent to commands, Future Link points to the IOSF specification document, which, in defining an "opcode," states "[e]very message type has its own distinct opcode. This opcode is used by endpoints to *define the structure of the message packet*." (*Id.* at 20) Future Link contends that, at minimum, a factual dispute exists as to whether an IOSF "opcode" is a command, and disputes the fairness of Intel's dissection of FLS's expert – Dr. Mangione-Smith's – opinion. (*Id.* at 21) Next, Future Link insists that even if "opcodes" equate to "commands," the IOSF still infringes because the claims do not prohibit data and commands from being transmitted over the same interconnects. (*Id.* at 22) Furthermore, Future Link argues that claims 9 and 10 specifically recite which interconnect should be used to transmit commands, negating any suggestion that commands could only be transmitted via the command interconnect.[10] (*Id.* at 24)

The Court agrees with Future Link that, drawing all reasonable inferences in its favor, genuine disputes of material fact exist as to whether (1) "opcodes" are "commands" within the context of the patent and (2) if so, whether the patent requires data and commands to be transmitted only on separate interconnects, or whether it allows them to be transmitted over the same interconnect. The Court will, therefore, deny summary judgment.

---

[10] Claim 10 is not asserted.

### 4. U.S. Patent No. 5,870,570 ("the '570 patent")

The '570 patent is directed to "[a] multiple peripheral component interconnect (PCI)

agent integrated circuit device for connecting to an external PCI bus." '570 Patent, Abstract.

The only asserted claim, claim 17, contains the term "identification device select decoder," which

the Court construed as "a PCI-compliant decoder that identifies the target of a configuration

access." (D.I. 378 at 20) The Court further found the claims of the '570 patent are "limited to

PCI-compliant embodiments." (*Id.*)

Intel asserts that products containing the IOSF technology cannot infringe the asserted

claim because the IOSF technology "has nothing to do with PCI" and does not comply with it.

(D.I. 523 at 26) Unlike PCI-complaint products, the IOSF technology does not undergo PCI-

compliance testing or certification. (*Id.*) Intel also argues that its products do not practice the

"identification device select decoder" as required by claim 17. (*Id.* at 28)

Future Link counters that the IOSF is PCI-compliant, as is evident from the facts that

(1) Intel's own engineers refer to it as such, (2) Intel's manuals label IOSF bus implementations

as "PCI bus," and (3) Intel's specification acknowledges that many PCI features are the "key

driving factor leading to the definition of the Intel-proprietary IOSF architecture." (D.I. 553 at

25-26) Future Link also explains how Dr. Mangione-Smith conducted an element-by-element

analysis of claim 17 in his doctrine of equivalents analysis. (*Id.* at 27)

The Court finds that a material factual dispute exists as to whether the IOSF technology is

PCI-compliant. The Court does not agree with Intel that Future Link's arguments are only

supported by conclusory opinions. Rather, they are supported by evidence (cited in FLS's

briefing) from which a reasonable factfinder could find for FLS. The Court will, therefore, deny

Intel's motion for summary judgment.

## IV. Future Link's Motion to Preclude Expert Testimony (D.I. 526)

### A. Dr. Perryman

Future Link argues that Intel expert, economist Dr. Perryman, does not understand the difference between a claim and a claim element, and therefore his opinions related to the meaning of "Necessary Claim" should be excluded for lack of qualification. (D.I. 528 at 24) Future Link seeks also to exclude the opinions of other Intel experts – Drs. Colwell, Eisenstadt, and Levy – who relied on Dr. Perryman's interpretation of "Necessary Claim." (*Id.* at 25)

Intel responds that Future Link's objections go to the *content* of Dr. Perryman's opinion rather than his expertise to provide the opinion. (D.I. 558 at 25) Intel shows that Dr. Perryman, "an expert on RAND- and other standards-related issues," has substantial experience testifying on standard setting organizations ("SSOs") issues and their impact on patent licensing markets, has been involved in several matters related to the offering of licenses on RAND terms in multiple industries, and has authored and presented academic papers at conferences co-sponsored by SSOs. (*Id.* at 24) The lone question-and-answer deposition testimony that Future Link cites in asserting that Dr. Perryman is unqualified, Intel argues, was taken out of context and also unclear. (*Id.* at 23, 25)

The Court agrees with Intel that the one instance of deposition testimony that Future Link points to is insufficient to prove that Dr. Perryman is not qualified to offer the opinions he seeks to present. This isolated incident does not show that he fails to understand the difference between a claim and a claim element. To the extent FLS's motion is based on Dr. Perryman's purported lack of qualification, it will be denied.

However, because the Court has found (as described above in Section II.A) that Dr.

Perryman's and Intel's interpretation of "Necessary Claim" improperly expands the scope of such

"Necessary Claims," Dr. Perryman's opinion on such matters, and the other Intel experts'

reliance on them, will be excluded. These opinions are based on an interpretation of the Bylaws'

reference to "Necessary Claim" which the Court has rejected. Hence, to the extent necessary to

exclude the opinions based on Dr. Perryman's erroneous interpretation of "Necessary Claim," the

Court will grant FLS's motion.

## B. Dr. Levy

Future Link seeks to exclude the opinions of Intel's expert Dr. Levy regarding his

anticipation and obviousness analyses in connection with the '754 and '680 patents, based on Dr.

Levy's failure to apply the Court's claim construction. (D.I. 528 at 26) With respect to the '754

patent, Future Link asserts that Dr. Levy failed to apply the term "external bus control circuits" as

construed by the Court. (*Id.*) Dr. Levy fails to discuss how any aspect of two asserted

anticipation references, Chambers '570 and Istkin '865, discloses any aspect of "a wide variety of

shared bus standards," as required by the Court's construction of "external bus control circuits."

(*Id.* at 27) With respect to the '680 patent, Future Link asserts that Dr. Levy failed to apply the

Court's constructions of two pairs of terms that Intel initially requested the Court construe, terms

that Intel now applies in "precisely the way that Intel argued to the Court the terms should not be

applied." (*Id.* at 29)

Intel responds that Dr. Levy consistently acknowledged and applied the Court's claim

constructions regarding both patents. (D.I. 558 at 27) Future Link's disagreement with Dr. Levy,

according to Intel, actually relates to Dr. Levy's alternative invalidity analysis, which Dr. Levy

24

properly offered under the assumption (which Intel disputes) that Future Link's infringement allegations are proven correct. (*Id.* at 29) Furthermore, Intel asserts, any inconsistencies in Dr. Levy's opinions are not grounds for exclusion, but rather, are more properly left to cross-examination. (*Id.* at 31)

The Court agrees with Intel that Dr. Levy's analyses should not be stricken. Dr. Levy asserts that he applied the Court's claim construction and the Court is not persuaded that he failed to do so. Nor is Dr. Levy's decision to offer alternative opinions – including based on the assumption that Intel's infringement position is rejected – a basis for striking his opinions. The Court will deny FLS's motion.

## C. Invalidity Analyses

Future Link contends that Intel's experts' opinions are based on constructions those experts consider to be incorrect and, on that basis, should be excluded. (D.I. 528 at 30) Because Intel's experts' base their conclusions of patent invalidity on interpretations of the patent claims that they "dispute or disclaim entirely," Future Link contends, their opinions should be excluded. (*Id.* at 32)

Intel responds that Future Link's motion, which constitutes a "sweeping request span[ning] four experts, dozens of invalidity references, and if granted, could vitiate Intel's invalidity defenses to every asserted patent," must be denied for two reasons. (D.I 558 at 31-32) First, FLS's motion fails to meet its burden to specify how any particular invalidity opinion merits exclusion. (*Id.* at 32-34) Second, Intel contends that its experts' analysis of Future Link's interpretation of the claims and claim language is permitted as an alternative theory of invalidity. (*Id.* at 34-37)

25

The Court agrees with Intel. Future Link's sweeping motion lacks merit. Future Link

misconstrues the Federal Circuit's holding in *Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522

F.3d 1348, 1363-64 (Fed. Cir. 2008), which does not preclude how Intel's experts have

proceeded but instead holds that "anticipation cannot be proved by merely establishing that one

'practices the prior art.'" Intel's experts have not proceeded inconsistently with *Zenith*.

The Court will, therefore, deny Future Link's motion.

## D. Commercialization Analyses

Similar to its motion to exclude Intel's experts' invalidity opinions, Future Link seeks to

preclude Intel's experts from testifying about commercialization of the Philips patents based on

claim constructions the experts consider incorrect. (D.I. 528 at 36) Future Link provides no

further analysis and merely refers the court to its arguments to exclude the invalidity opinions

above. (*Id.*) For the same reasons already given, this embodiment of FLS's argument lacks merit

as well. The Court will, therefore, deny Future Link's motion.

## E. Unverified and Undisclosed Intel Employees

Future Link asserts that two of Intel's experts rely on improperly-withheld facts and

unverified information from undisclosed Intel employees and, therefore, such opinions should be

excluded.[11] (D.I. 528 at 36) In particular, Future Link argues that: (1) Intel expert Randy Steck

improperly relied on undisclosed expert opinions of Intel employee Diane Bryant, in opining on

the time-saving benefits of IOSF (*id.* at 38); and (2) Intel expert Dr. David August improperly

relied on information received from Intel employee Sean Mirkes, in opining that a combination

---

[11] The Court addressed Future Link's arguments regarding Dr. Leonard's reliance on undisclosed Intel employees (Robert Rainbolt, Terri Schmiesing, and Patricio De La Rocha) in its prior Memorandum Opinion. (D.I. 618 at 11)

of four 256-bit instructions and eight 128-bit instructions "prevented the Intel processors from changing the clocking state" (*id.* at 40).

Intel responds that each of the identified experts relied on sufficient facts and data to support their conclusions. (D.I. 558 at 39) Mr. Steck cited Ms. Bryant three times in his report, each time citing a statement of fact (none of which is "a lynchpin of Mr. Steck's analysis"); Mr. Streck also has "substantial experience, analysis in this case, and . . . independent bases for his conclusions." (*Id.* at 41-43) While Mr. Steck was unfamiliar with Ms. Bryant's knowledge of the Intel IOSF standard, he used to work with Ms. Bryant and knew that her division was responsible for server microprocessor development. (*Id.* at 43) With respect to Dr. August, Intel asserts that his opinions comply with Fed. R. of Ev. 702 and 703, as he only relied on Mr. Mirkes for facts "to confirm that the initial conditions in his tests accurately reflected the operation of Intel's processors." (*Id.* at 44)

The Court previously held: "it can be inappropriate for an expert to rely on statements from individuals employed by a litigant who are not disclosed by the litigant, are not subject to deposition, and cannot be called as witnesses at trial." (D.I. 618 at 12) That is not what occurred here. Instead, Mr. Steck and Dr. August support their opinions independent of information derived from the Intel employees. Moreover, Future Link has identified both undisclosed employees and has sufficient time before trial to depose them, should Future Link wish to do so.

The Court will, therefore, deny Future Link's motion.

27

## V. Intel's Motion for Summary Judgment of No Willfulness and No Unclean Hands (D.I. 531)

### A. Willfulness

Intel seeks summary judgment that it has not willfully infringed any of the patents-in-suit. Intel characterizes FLS's willfulness argument as based on allegations that "Intel's products are similar to the embodiments disclosed in the patents-in-suit," Intel "fostered a corporate atmosphere in which employees are encouraged to turn a blind eye to the rights of others," and "Intel had enormous motivation to infringe." (D.I. 534 at 2) In Intel's view, none of these contentions – even if true – support a finding of willfulness. Further, for the six patents asserted in FLS's counterclaims but not asserted in Intel's declaratory judgment complaint, Intel contends that FLS has failed to prove that Intel had pre-suit knowledge of these patents; and for the nine patents in the declaratory judgment complaint, FLS has failed to provide evidence of copying or other improper conduct.

Future Link responds that Intel's own engineers concede that they avoid reviewing other, non-Intel patents so as to avoid willfully infringing them. (D.I. 553 at 28) This type of willful blindness, Future Link asserts, is "antithetical to the type of responsible behavior encouraged by § 284, and itself is powerful evidence of willfulness." (*Id.*) Future Link points to its experts' depictions of Intel's implementation of the accused technology identically to the patented embodiments, the lack of evidence of Intel ever investigating if its products infringed, Intel's corporate atmosphere encouraging employees to "turn a blind eye" to patents, Intel's motivation to infringe, the lengthy period during which infringement has continued, Intel's failure to disable patented features when it could do so in its products, and Intel's litigation misconduct. (*Id.*; *see*

*also* D.I. 560, Ex. 2 at ¶ 403)

It may be difficult to see how a reasonable factfinder would view the panoply of conduct alleged by Future Link (if proven) to be "egregious . . . wanton, bad-faith, deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). However, taking the evidence in the light most favorable to Future Link, the Court concludes that it cannot grant summary judgment of non-willfulness. The Court will deny Intel's motion.

## B. Unclean Hands

As with respect to willfulness, in relation to unclean hands Intel asserts that FLS's conclusory allegations – applied verbatim to support both its willfulness and unclean hands defense – do not satisfy the requirement of "shocking the moral sensibilities" necessary to support an unclean hands defense. (D.I. 534 at 4) Future Link responds that Intel has "engaged in years of willful blindness," "pursued meritless positions," "withheld essential discovery" regarding infringement, and "repeatedly drove up litigation costs." (D.I. 553 at 29)

The Court concludes that Future Link has not come forward with evidence sufficient to support a reasonable factfinder finding that Intel has acted with unclean hands. FLS points only to Intel's purported failure to substantiate its invalidity and infringement theories. The Court does not view the record as so devoid of evidence supporting Intel's position on these hotly-contested issues so as to "shock[] the moral sensibilities."

The Court will, therefore, grant Intel's motion.

## VI. Conclusion

An appropriate Order follows.